IN RE the MARRIAGE OF:

Barbara G. HOKIN, Petitioner-Appellant,

v.

Lowell E. HOKIN, Respondent-Respondent.

Court of Appeals

*No. 98–3680. Submitted on briefs July 9, 1999.—Decided October 21, 1999.*

(Also reported in 605 N.W.2d 219.)

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *David G. Walsh* and *Michael S. Heffernan* of *Foley & Lardner* of Madison.

On behalf of the respondent-respondent, the cause was submitted on the brief of *Linda Roberson, Jane D. Clark* and *Julie A. D'Angelo* of *Balisle & Roberson, S.C.* of Madison.

Before Dykman, P.J., Vergeront and Roggensack, JJ.

¶ 1. VERGERONT, J. Barbara Hokin appeals the property division, denial of maintenance, and child support in her judgment of divorce from Lowell Hokin. She contends the trial court erroneously exercised its discretion in using a coverture fraction to divide Lowell's retirement account because the use of a coverture fraction is based on ch. 766, STATS., rather than ch. 767, STATS.; is not an accurate reflection of the interest in the account Lowell brought to the marriage and the growth of that interest during the marriage; and results in a deviation from the presumed 50/50 property division not supported by the court's findings or the statutory factors. Barbara also contends the trial court erroneously exercised its discretion on several grounds in denying maintenance, including that it impermissibly double counted her portion of the retirement account by imputing monthly benefits to her. That same imputation of income to her in setting child support, she contends, was also an erroneous exercise of discretion.

¶ 2. We conclude the court did not apply ch. 766, STATS., in deciding to use a coverture fraction and that

use of a coverture fraction is not prohibited under ch. 767, STATS. However, we decide the use in this case resulted in a property division that did not adequately take into account the statutory presumption of a 50/50 division and Barbara's non-economic contributions to the marriage. We also decide that imputing to Barbara her portion of the retirement account as income for purposes of a maintenance determination and child support was not an erroneous exercise of discretion, and that the court otherwise properly exercised its discretion in denying maintenance. We therefore affirm the court's decision denying maintenance and awarding child support, reverse the decision on property division, and remand for further proceedings on that issue.

## BACKGROUND

¶ 3.   Lowell and Barbara married in March 1978 when Lowell was fifty-three and Barbara was thirty-two. They met in Maine in 1971 and shortly thereafter Barbara moved to Madison, Lowell's home. They began living together early in 1972. Barbara's daughter from a prior marriage, who was seven at the time, moved with her and lived with the couple.

¶ 4.   Before Lowell met Barbara, he had obtained an M.D. and a Ph.D. At the time they met, he was employed by the University of Wisconsin as a tenured professor and chair of the Pharmacology Department; Barbara had obtained a B.S. in chemistry and was working as a research technician in a laboratory. After moving to Madison she worked for approximately three years in the University of Wisconsin biochemistry department, then returned to school and obtained an undergraduate degree in finance before the couple married. Shortly after the marriage she obtained a

187

master's degree in real estate. Barbara testified that she was unable to find work in the Madison area. According to her testimony, she went back to school in 1983, but did not get a degree because in January 1984 the parties' child, Ian, was born.

¶ 5. The trial court found that Barbara was the primary homemaker throughout the marriage and the primary child rearer, although Lowell spent considerable time with Ian and did a moderate amount of housework. She earned no more than $5,000 during the marriage and did not contribute financially to the support of the family. Lowell was the sole financial support of the household, except for the $150 per month in child support that Barbara received from her daughter's father. Lowell paid almost all of Barbara's daughter's expenses until she left home in 1982, and paid his child support obligations for his three children from his prior marriage.

¶ 6. The parties separated in 1994 and shared equally in Ian's physical placement during the separation. That was the arrangement they agreed to as a term of the divorce. After a trial on the disputed issues of property division, maintenance and child support, the court issued a decision containing the following findings of fact, among others. Lowell's retirement account with the University of Wisconsin had a money purchase value of approximately $79,100 on the date of the marriage and approximately $1,641,121 on the trial date (July 23, 1998). Lowell is seventy-four years old, in good health, still working full time as a professor and earning $9,857 gross per month plus $2,045 in social security. He hopes to continue working, but funding for research grants is uncertain because of his age. Barbara is fifty-three years old, in good health, currently unemployed and receiving $2,500 from Low-

ell in family support under a temporary order and $510 per month from social security for Ian, which will end upon divorce. Since the parties separated in 1994, Barbara has had only two paying jobs, both with temporary agencies and each lasting for one month. She applied for seventeen jobs. Based on the testimony of a vocational expert, which the court found credible, she has the capacity to earn $25,000 per year gross within six months in an entry level position with a leasing company, real estate company or property management company, and the potential for regular and substantial increases thereafter.

¶ 7.    The trial court divided Lowell's retirement account, by far the most significant asset, by awarding $1,240,821 to Lowell and $400,300 to Barbara. For this division, the court used a coverture fraction, a fraction the numerator of which is the length of the marriage—twenty years—and the denominator of which is Lowell's total years in the plan—forty-one. The court awarded 21/41 of the value of the retirement account on the date of trial to Lowell, and divided 20/41 equally between Lowell and Barbara. The court divided equally the remainder of the marital estate, which had a net value of $176,654.[1]

¶ 8.    The trial court denied maintenance to Barbara. It found she was entitled to immediately receive

---

[1] This total did not include the parties' ski chalet, valued at $120,000, which the parties agreed to retain as joint owners, tenants in common; or certain bank accounts, which the parties agreed to divide as follows: $4,013.52 to Lowell; $2,376.52 to Barbara; and the account in Lowell's and his mother's name to Lowell and his siblings. The court determined that a piece of real estate valued at $45,000 and an inheritance from Lowell's daughter were not part of the marital estate. Barbara did not contend they were.

$2,246 per month as her share of the retirement account for the rest of her life; she could earn $25,000 annually within three to six months, and she would have $3,000 annual income from her share of the property division excluding the retirement account. The court applied the shared-time formula of WIS. ADM. CODE § HSS 80.04(2)(c)[2] for equal time sharing to Barbara's monthly income of $4,579 and to Lowell's monthly income of $11,902, and set child support from Lowell to Barbara at $534 per month for six months, to allow Barbara to obtain employment at her earning capacity, and $416 per month thereafter.[3]

## DISCUSSION

■

¶ 9. The division of the marital estate, the decision whether to award maintenance, and, if so, how much, and the amount of child support are all committed to the trial court's discretion. *Sellers v. Sellers*, 201 Wis. 2d 578, 585, 549 N.W.2d 481, 484 (Ct. App. 1996). We affirm a trial court's discretionary decision if the court makes a rational, reasoned decision and applies the correct legal standard to the facts of record. *Id.* We accept all findings of fact made by the trial court unless

---

[2] This has since been renumbered to WIS. ADM. CODE § DWD 40.04(2). *See* Wis. Adm. Register No. 523 (July 1999). Under this formula, when parents each have a child 50% of the time, the income of each parent is multiplied by 17%, and each product is multiplied by 33.4%. The lesser obligation is subtracted from the greater to determine the amount the higher income parent pays to the other parent.

[3] There were many factual and legal issues involved in this divorce, and the trial court made extensive and detailed findings of fact and conclusions of law, which greatly facilitated our review.

they are clearly erroneous. Section 805.17(2), STATS. Whether the trial court applied the correct legal standard is a question of law, which this court reviews de novo. *Cook v. Cook*, 208 Wis. 2d 166, 172, 560 N.W.2d 246, 249 (1997).

## I. *Property Division.*

*Use of Coverture Fraction in General.*

¶ 10.    Barbara contends that in using a coverture fraction to divide the largest asset in the marital estate, the court improperly relied on the Wisconsin Marital Property Act, ch. 766, STATS. That chapter mandates the use of a coverture fraction to determine the marital property component of a deferred employment benefit attributable to employment of a spouse occurring while the spouse is married and partially before and partially after the determination date.[4] *See* § 766.62(2), STATS. It is well established, however, that the division of property upon divorce is not governed by ch. 766 but rather by ch. 767, STATS. *See Kuhlman v. Kuhlman*, 146 Wis. 2d 588, 591, 432 N.W.2d 295, 296 (Ct. App. 1988). With respect to the division of property on divorce, the only property that remains individual property and not subject to division is property acquired before or during the marriage by gift or inheritance, or funds acquired from either. *See* § 767.255(2)(a), STATS.[5] All other property is part of the marital estate, and the court is to presume that it is to

---

[4] The determination date is the last to occur of the marriage date, the date both parties are domiciled in Wisconsin or January 1, 1986. *See* § 766.01(5), STATS.

[5] Property that is separate under § 767.255(2)(a), STATS., may be divided if the court finds that refusal to do so will create

be divided equally, although the court may alter the distribution after considering various factors. *See* § 767.255(3).[6] Therefore, while under ch. 766, a cover-

---

a hardship on the other party or the children. *See* § 767.255(2)(b).

[6] Section 767.255(3), STATS., provides:

   (3) The court shall presume that all property not described in sub. (2) (a) is to be divided equally between the parties, but may alter this distribution without regard to marital misconduct after considering all of the following:
   (a) The length of the marriage.
   (b) The property brought to the marriage by each party.
   (c) Whether one of the parties has substantial assets not subject to division by the court.
   (d) The contribution of each party to the marriage, giving appropriate economic value to each party's contribution in home-making and child care services.
   (e) The age and physical and emotional health of the parties.
   (f) The contribution by one party to the education, training or increased earning power of the other.
   (g) The earning capacity of each party, including educational background, training, employment skills, work experience, length of absence from the job market, custodial responsibilities for children and the time and expense necessary to acquire sufficient education or training to enable the party to become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage.
   (h) The desirability of awarding the family home or the right to live therein for a reasonable period to the party having physical placement for the greater period of time.
   (i) The amount and duration of an order under s. 767.26 granting maintenance payments to either party, any order for periodic family support payments under s. 767.261 and whether the property division is in lieu of such payments.
   (j) Other economic circumstances of each party, including pension benefits, vested or unvested, and future interests.
   (k) The tax consequences to each party.
   (L) Any written agreements made by the parties before or during the marriage concerning any arrangement for property distribution; such agreements shall be binding upon the court except that no such agreement shall be binding where the terms of the

ture fraction is applied to determine what portion of a pension is individual rather than marital property, under the divorce statute a spouse's entire interest in a pension—whether existing before the marriage or acquired during a marriage—is part of the marital estate subject to division in the divorce. *See Steinke v. Steinke,* 126 Wis. 2d 372, 380–81, 376 N.W.2d 839, 843–44 (1985). The increase in value of property brought to the marriage, including interest in a pension, is also part of the marital estate subject to division in divorce. *See Arneson v. Arneson,* 120 Wis. 2d 236, 246, 355 N.W.2d 16, 21 (Ct. App. 1984).

¶ 11.  We do not agree with Barbara that the trial court relied on ch. 766, STATS., in employing a coverture fraction. The court expressly recognized that the entire value of Lowell's retirement account was part of the martial estate for purposes of property division, and nothing in its decision indicates that it believed it was obligated to employ a coverture fraction in dividing that asset because of § 766.62(2), STATS. Rather, the court explained that it read *Cook,* 208 Wis. 2d 166, 560 N.W.2d 661, as "tacitly approv[ing]" this method of dividing a pension in a divorce and it believed this was "a fair method of responding to the marital partnership of Lowell and Barbara and to the nature of this asset."

¶ 12.  We do agree with Barbara that *Cook* does not tacitly approve of this method of dividing a pension. In *Cook,* in reciting that the trial court had ruled each party was to receive one-half of 11/23 of the husband's military retirement pay as it was paid monthly and the

agreement are inequitable as to either party. The court shall presume any such agreement to be equitable as to both parties.

(m)  Such other factors as the court may in each individual case determine to be relevant.

husband was to receive 12/23, the court expressly stated in a footnote:

> The parties do not challenge this division, which is based on the number of years of the marriage during which the husband was in military service. They dispute whether military retired pay is subject at all to property division on divorce.

*Id.* at 170 n.2, 560 N.W.2d at 248. There is no other reference to the manner in which the trial court divided the pension. *Cook* therefore must be read as *not* addressing the question whether a court may employ a coverture fraction in dividing a pension upon divorce.

¶ 13. Although we agree with Barbara that no Wisconsin case has held that the use of a coverture fraction is or may be permissible to divide a pension, we do not agree with her apparent conclusion that a trial court may never do so. Property brought to a marriage is an appropriate factor to consider in deviating from the presumed equal division of the marital estate, *see* § 767.255(3)(b), STATS., and the coverture fraction may, depending on the facts in a particular case, be an appropriate way to divide a spouse's pension as part of the overall division of property. The inquiry in each case is whether the use of a coverture fraction is a proper exercise of the court's discretion in dividing the marital estate of the parties, given the particular facts of the case and the applicable statutory and case law. We turn to that inquiry now.[7]

---

[7] In addressing this inquiry, we do not consider the numerous cases that Lowell cites from other jurisdictions to be helpful. We must examine the trial court's exercise of its discretion in the context of Wisconsin divorce statutes—under which Lowell's entire pension is part of the marital estate and the

*Application of Coverture Fraction in this Case.*

¶ 14. The balances in Lowell's retirement account on the date of the marriage and on July 1, 1998—$79,136.46 and $1,641,121.50 respectively—are undisputed. The trial court set forth these reasons for applying a coverture fraction to divide the account: Lowell's twenty-one years of employment service before the marriage "now produces more than one-half of its extraordinary value"; because of Lowell's previous divorce in 1974, he already has had "to recognize the contributions of a marital partner in acquiring a good portion of it, and it would now be unfair to credit Barbara with contributing to its acquisition also"; the portion of the retirement account Lowell brought to the marriage has not been used by either party; the increase during the marriage in the value of that portion was due solely to investment gains realized by

presumption is a 50/50 division of the marital estate. None of the other jurisdictions Lowell refers us to have similar statutes on either point. Rather, the statutes of the other jurisdictions, in more or less detail and with various wordings, include in the marital estate, for purposes of divorce, only property or pension rights acquired or accrued during the marriage. *See, e.g., Kurz v. Kurz*, 443 N.W.2d 782, 786 (Mich. Ct. App. 1989); *Livingston v. Livingston*, 633 So. 2d 1162, 1164 (Fla. Dist. Ct. App. 1994); *Powell v. Powell*, 577 A.2d 576, 579 (Pa. Super. Ct. 1990). Therefore, the prevalence of the use of a coverture fraction to divide pensions upon divorce in other jurisdictions does not assist us in answering the question whether the use in this case, under Wisconsin law, is an appropriate exercise of the trial court's discretion. Moreover, none of the cases Lowell refers us to discuss in any detail the specific challenge that Barbara makes to the use of a coverture fraction in this case—that it overvalues the property Lowell brought to the marriage and the increase in value of that property during the marriage.

actions taken by the Wisconsin Retirement System due to market forces, was not income to Lowell and Barbara in the years accrued, was not guaranteed, and was not available to Lowell until after age fifty-five and he retired. Finally, the court stated that it would be unfair to Lowell and a windfall to Barbara to "freeze the value of the premarital portion of the retirement account at its value [on the date of their marriage]." The court recognized the coverture fraction was not "absolutely precise," but decided it is "a fair way of estimating the value of the marital portion." The court also stated that any imprecision was more than offset by the equal division of the non-gifted property Lowell brought to the marriage, which the court found had a value in excess of $50,000.

¶ 15.  In addition, the court considered these factual findings in deciding that the resulting overall property division was fair to both parties. Lowell was fifty-three and well established in his career when they married, while Barbara was thirty-two and had taken few steps to advance a career. Lowell provided virtually all of the financial support to the family, which initially included Barbara's child from her previous marriage, and he chose to work beyond the age of retirement. He paid for Barbara to acquire substantial additional schooling, but "she chose not to work, even when her child-rearing responsibilities did not interfere with her ability to do so." Since the parties separated in 1994, Barbara's efforts to secure employment have been minimal and unreasonable.

¶ 16.  Barbara contends the record establishes that the coverture fraction is not an accurate reflection of the amount of retirement benefits Lowell brought to the marriage and the growth in value of that property during the marriage. She also contends the resulting

deviation from the presumed 50/50 property division is not justified by the statutory factors.[8] With respect to the first contention, Barbara points out that the only witness to testify concerning the value or growth in value of the retirement account was that of Barbara's expert, a certified public accountant, who opined that dividing the pension using a coverture fraction would not be a "valid method" of dividing the pension because "most of the contributions have been made post-marriage and also most of the growth has been made post-marriage and to just take a percentage based on number of years doesn't accurately reflect that growth in the account during the marriage." The only annual statements of the retirement account we have been able to locate in the record are those for 1/1/73 and for 1/1/98. The latter statement shows that the three highest years of earnings were 1992–93, 1995–96 and 1996–97. That statement also shows that during 1997 the balance of employee-required contributions increased from $654,922.60 to $785,683.63, with $124,947.60 of that increase due to interest and $5,813 due to employee contributions.[9]

¶ 17. The trial court did not discuss this evidence, or explain why the coverture fraction is a reasonably accurate way to determine the increase during the marriage attributable to the pre-marriage

[8] Barbara contends the overall division is 78/22, while Lowell contends it is 71.66/28.34. The precise percentage does not affect our analysis.

[9] The retirement benefit projections as shown on the annual statement are computed based on either the three highest years of earnings (the monthly formula benefit) or the money purchase balance (computed by adding the employee-required contribution with a matching and equal employer contribution), with the retiree entitled to the higher of the two.

value. Lowell does not offer an explanation either. However, we need not decide whether this record is sufficient to support the trial court's finding that using a coverture fraction is a reasonably accurate way to compute the value of the balance in Lowell's account on the marriage date plus the increase during the marriage attributable to that amount. Even if it were, the question would remain whether the resulting deviation in the overall property division from the presumed 50/50 is a proper exercise of the court's discretion.

¶ 18. The factors identified by the court, other than that of the property brought to the marriage, relate primarily to each party's contribution to the marriage and to the education or increased earning power of the other. *See* § 767.255(3)(b) and (g), STATS. It is apparent the trial court considered Lowell's contributions to the marriage—which were primarily financial—significantly greater than Barbara's contributions as primary homemaker and caretaker of their child. It appears the court also considered Barbara's failure to have significant employment during the marriage to the extent allowed by her child-rearing responsibilities, both before the parties separated and after, to be a negative factor in the property division.

¶ 19. While consideration and weighing of the contributions of each party to the marriage for purposes of property division is within the trial court's discretion, that weighing must be done within the context established by statute and case law. The basis of the statutory presumption of a 50/50 property division is the concept that marriage is a shared enterprise or joint undertaking. *See Steinke*, 126 Wis. 2d at 377, 376 N.W.2d at 842. The presumption effectuates the policy that each spouse makes a valuable contribution to the marriage and each spouse should be compensated for

his or her respective contributions. *Id.* at 380–81, 376 N.W.2d at 843–44. The fact that one spouse accumulates the bulk of the estate while the other spouse is primarily a homemaker and cares for the parties' children does not "lessen [the latter's] role in the marriage or . . . entitlement to the estate." *Asbeck v. Asbeck*, 116 Wis. 2d 289, 297, 342 N.W.2d 750, 754 (Ct. App. 1983). In the context of maintenance, the supreme court has said it will respect the decision of the spouse who cares for small children to remain home with them after the divorce rather than pursue a career. *Hartung v. Hartung*, 102 Wis. 2d 58, 68, 306 N.W.2d 16, 21 (1981). This principle is even more fitting to the choices parties make during a marriage and before separation: generally, a court should respect the choices a couple makes during a marriage about whether one of them, and if so, which one, should remain home to care for children or for other reasons, rather than work outside the home.

¶ 20.  In this case, there was no financial need for Barbara to work during the marriage. Lowell's chosen career provided a very comfortable living for the family and it was a demanding career. Lowell, as the trial court found, left the decision about working outside the home to Barbara, and she chose not to do so.[10] Under these circumstances, the fact that Barbara did not work outside the home during the marriage and before

[10] Barbara testified that the couple decided jointly that she should stay home to care for their child. Lowell testified that he left the decision to Barbara whether she would work and whatever she decided was okay with him. The trial court credited Lowell's testimony on this point. We accept the trial court's finding and, based on that finding, view the decision that Barbara stay home rather than pursue a career as one made by the couple during their marriage: Lowell decided to leave the choice to Barbara and he accepted her choice.

the separation does not justify a deviation from the presumed 50/50 division. Her insufficient efforts to find employment during the separation preceding the divorce were taken into account in the maintenance decision, as we discuss later.

¶ 21. We conclude we must reverse the trial court's decision on property division. The overall division of property is a substantial deviation from the presumed 50/50 percentage. In a shorter marriage,[11] such an emphasis on which party generated the assets that make up the marital estate might well be appropriate. However, in this case we conclude that starting with Lowell's retirement account and attempting to "return" to Lowell the value of that account on the date of the marriage and the increase in value during the marriage attributable to that amount, and then dividing the remainder of the retirement account and other assets in half, does not adequately recognize the length of the marriage, Barbara's contributions to it, or the 50/50 presumption.[12]

## II. Maintenance.

¶ 22. In deciding whether to award maintenance, and, if so, for how long and in what amount, the court is to consider the factors in § 767.26, STATS.,[13] which are

[11] The trial court described twenty years as a marriage of moderate length, and Barbara contends it is a long marriage. Which of the two labels one chooses does not affect our analysis.

[12] We emphasize that we do not hold that the court on remand may not deviate from that presumption because of the property brought to the marriage or the parties' contributions to the marriage. (Indeed, Barbara's brief acknowledges that some deviation may be an appropriate exercise of the trial court's discretion.)

[13] Section 767.26, STATS., provides as follows:

designed to further two objectives: support and fairness. *Olson v. Olson*, 186 Wis. 2d 287, 293, 520 N.W.2d 284, 286 (Ct. App. 1994). The former ensures the spouse is supported in accordance with the needs and earning capacities of the parties, the latter ensures a fair and equitable arrangement between the parties in each individual case. *Id.*

¶ 23.  The trial court concluded that neither the support nor the fairness objective warranted an award

**Maintenance payments**. Upon every judgment of annulment, divorce or legal separation, or in rendering a judgment in an action under s. 767.02 (1) (g) or (j), the court may grant an order requiring maintenance payments to either party for a limited or indefinite length of time after considering:

(1)  The length of the marriage.

(2)  The age and physical and emotional health of the parties.

(3)  The division of property made under s. 767.255.

(4)  The educational level of each party at the time of marriage and at the time the action is commenced.

(5)  The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, custodial responsibilities for children and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.

(6)  The feasibility that the party seeking maintenance can become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and, if so, the length of time necessary to achieve this goal.

(7)  The tax consequences to each party.

(8)  Any mutual agreement made by the parties before or during the marriage, according to the terms of which one party has made financial or service contributions to the other with the expectation of reciprocation or other compensation in the future, where such repayment has not been made, or any mutual agreement made by the parties before or during the marriage concerning any arrangement for the financial support of the parties.

(9)  The contribution by one party to the education, training or increased earning power of the other.

(10)  Such other factors as the court may in each individual case determine to be relevant.

of maintenance to Barbara. With respect to support, the court determined that with the imputed annual employment income of $25,000, the estimated $3,000 in annual earnings that the assets awarded to her would yield, and the $2,246 per month she could draw on immediately from her share of the retirement account, she could meet what it found was a reasonable budget of $4,286 per month. Concerning Barbara's future needs, the court stated that the monthly payments from Lowell's retirement account will continue for her life, adjusted annually; she will receive enhanced social security benefits based on Lowell's earnings; and she has more than a decade to accumulate her own retirement benefits.

¶ 24. With respect to the fairness objective of maintenance, the court considered the following, in addition to the factors it had discussed regarding the property division: Barbara played no role in the establishment of Lowell's career, which occurred before the marriage, and did not contribute to its enhancement during the marriage; although her child-care responsibilities at times reduced her ability to pursue a career, she had Lowell's support and the time "for much of the marriage" to seek work outside the home but chose not to do so; Lowell financially supported her while she acquired additional degrees in a new field; Lowell provided her with a comfortable lifestyle during the marriage and provided support during the separation; the property division was generous and a product of Lowell's efforts, to which the trial court attached even greater weight because he has continued working long after most people retire. The court found that Lowell could pay some maintenance, but neither the support nor the fairness objective required that he do so.

¶ 25.   Barbara challenges the trial court's decision as inconsistent with both the support and fairness objectives of maintenance. She contends the trial court's decision to impute the monthly retirement benefits to her as income is an erroneous exercise of discretion because it forces Barbara to begin drawing on her share of the retirement account now, while Lowell will not do so as long as he continues working, which he expressed a desire to do. The effect of this, Barbara contends, is that she will have reduced benefits available to her at normal retirement age, while Lowell's monthly benefits will increase due to his delay in tapping into the retirement fund. As a result, Barbara contends, she will not have her needs met upon her retirement, since she will not have time to accumulate any significant retirement benefits from her own employment. She also challenges the trial court's findings regarding a reasonable budget for her. Finally, she asserts that fairness requires an award of maintenance.

¶ 26.   We consider first the issue of "double counting"—that is, counting as income for maintenance or child support purposes the payout from, or distribution of, an asset the value of which has been included in the property division. As the trial court and both parties recognize, there is not an absolute rule against double counting. *Cook*, 208 Wis. 2d at 180, 560 N.W.2d at 252. Rather, the rule "serves to warn parties, counsel and the courts to avoid unfairness by carefully considering the division of income-producing and non-income-producing assets and the probable effects of that division on the need for maintenance and the availability of income to both parents for child support." *Id.* The double counting cases discussed in *Cook* addressed whether income of the payor should be counted. How-

ever, in *Seidlitz v. Seidlitz*, 217 Wis. 2d 82, 90–92, 578 N.W.2d 638, 641–42 (Ct. App. 1998), we considered a challenge to a trial court's decision that the portion of a pension awarded to the non-working spouse as part of the property division should not be counted as income to her when she receives payments, for purposes of determining the amount of maintenance. We affirmed the decision as a proper exercise of discretion, noting that the payments from the pension fund represented the payout of the asset itself, unlike the income from rental properties awarded to her, which the trial court did count. We also observed that the trial court's decision was consistent with the well-established principle that one spouse should not be forced to invade the property division for current support while the other does not. *Id.* at 92, 578 N.W.2d at 642.

¶ 27.  The trial court here gave the following reasons for counting the monthly benefits as income to Barbara. The retirement account was treated separately from all other assets in the property division and was not offset by the award of other assets. The nature of this asset is unique in that it cannot be sold or transferred, does not provide a benefit until monthly annuity payments begin, and there is not a principle balance that is preserved. Given that the asset represents over eighty percent of the marital estate, it is reasonable to infer that Barbara and Lowell expected to rely principally on it for support when Lowell retired. When Lowell retires, which at seventy-four he has earned the right to do at any time, he will be relying on it to meet his current needs, since he will have to liquidate his share of the other income-producing assets to pay Barbara the equalizing payment.

██

¶ 28. We conclude the trial court's reasoning and decision demonstrates a proper exercise of discretion. The reason that Lowell is not drawing on his retirement benefits now is that he is still working; as soon as he retires, which he may do at any time, he will have to draw on his share of his retirement account as monthly income, just as Barbara is. Given Lowell's age, it is reasonable for the court to assume that he may retire at any time rather than assume he will continue to work for a significant period of time and accumulate more benefits for his retirement while Barbara is using hers to live on.

¶ 29. It is true that Barbara would receive greater monthly benefits from her portion of the account if she postponed receiving them. However, the trial court decided that Barbara's future needs would be met if she began drawing the benefits now, and that decision is supported by the record. Barbara will be entitled to social security benefits based on Lowell's life work. *See* 20 C.F.R. §§ 404.331 and 404.336. If she waits until she is sixty-five to receive these benefits[14] and he dies prior to then,[15] she will receive $2,045 per month. *See* 20 C.F.R. §§ 404.338 and 404.403(3). Should he be alive then, she will receive $1,022.50 per month until Lowell dies and the amount will then double.[16] *See id.*, 20 C.F.R. § 404.333.

---

[14] Although Barbara is eligible to receive the social security benefits at sixty-two, the amount may be reduced if she chooses that option. *See* 20 C.F.R. § 404.304(a).

[15] The trial court found Lowell's life expectancy to be ten years.

[16] These figures are based on the amount Lowell is currently receiving from social security as his "primary insurance

¶ 30. Barbara also contends the trial court erroneously exercised its discretion in denying her maintenance because it did so based on a finding that a reasonable budget for Barbara is $4,286 per month while a reasonable budget for Lowell is $6,753 per month. (Both budgets include Ian's needs for the time he is with each parent.) Even after Lowell's monthly payment to her for child support is deducted, Barbara asserts, the $2,000 per month difference is contrary to one of the goals of maintenance—providing support at pre-divorce standards. *See LaRocque v. LaRocque*, 139 Wis. 2d 23, 35, 406 N.W.2d 736, 740 (1987). However, Barbara does not explain what is erroneous about the court's factual findings regarding each party's budget. Nor does she point to any particular items that show an unfair disparity between her budget and Lowell's. The most significant item the court deleted from Barbara's budget was the $1,488 monthly expense for further schooling for her; the court did so because it found returning to school rather than seeking employment now was not a reasonable plan. That finding is supported by the record and Barbara does not challenge it. The court explained each of the other reductions it made to her budget, just as it did when it made reductions to Lowell's budget, and Barbara does not explain why any of those were erroneous or significantly affect her lifestyle. The court also added $500 per month to Barbara's budget, recognizing that she is not now living in a single-family home as she did during the marriage. Barbara does not point to any evidence in the record that shows this is insufficient. We conclude the court did not make erroneous findings of fact in establishing a reasonable budget for each party and did not

amount." That amount may increase due to automatic social security cost-of-living increases. *See* 20 C.F.R. § 404.270.

erroneously exercise its discretion in relying on the budgets it found to be reasonable for each party.

¶ 31.    We also conclude the trial court's decision to deny maintenance is not unfair to Barbara. Barbara's failure to take reasonable steps to find employment during the separation, a finding which is supported by the record and which Barbara does not challenge, makes the decision to impute $25,000 per year to her a proper exercise of discretion and one supported by the record. The income Barbara can earn from employment plus the monthly retirement benefits plus earnings on the property awarded to her are sufficient to meet what the court found to be a reasonable budget. The fact that Barbara did not contribute to the establishment or enhancement of Lowell's career while he supported her as she obtained additional degrees, distinguishes this case from those in which it is proper for the trial court to consider an equal division of total income as a starting point in determining maintenance. *See LaRocque*, 139 Wis. 2d at 39, 406 N.W.2d at 742. Assuming a property division that does not penalize Barbara for not working outside the home during the marriage, we are not persuaded that the court's decision to deny her maintenance is an erroneous exercise of discretion.

### III.   Child Support.

¶ 32.    Barbara also contends the court erroneously exercised its discretion in imputing to her the monthly retirement payments for child support purposes, making the same argument of unfairness that she made in her challenge to the court's imputation of this income for purposes of maintenance. Under the shared-time formula the court used, the result of the court's imputing the monthly retirement payments to

207

Barbara is that she receives less in child support from Lowell.

¶ 33. In the context of child support, the court in *Cook* explained that, because the child receives nothing from the property division, when a court considers a pension that was the subject of property division as income for child support purposes, it is counting the pension "for the first time between the parent and the child." *Cook*, 208 Wis. 2d at 181, 560 N.W.2d at 252. Whether to count such income for child support purposes, the court concluded, must be considered on a case-by-case basis, with the trial court exercising "its discretion to fashion an equitable scheme of property division and child support"; in this analysis, "it is critical that property division and child support (and maintenance, if any) be considered together." *Id.* at 183, 560 N.W.2d at 253. The court in *Cook* affirmed a trial court decision counting the monthly military retirement benefits received by the non-custodial parent in the property division in determining the amount of child support he should pay to the custodial parent. The trial court reasoned that both parents were drawing the retirement benefits as income; the guidelines presumed that the non-custodial parent, like the custodial parent, was contributing twenty-five percent of her income to the support of the two children; and it was necessary to draw on the income stream to both parents to adequately provide for the children. The supreme court held this was a proper exercise of discretion, considering both fairness between the parties and the needs of the children. *Id.* at 184, 560 N.W.2d at 253–54.

■

¶ 34. We have already concluded that imputing the monthly retirement benefits to Barbara is not

unfair to her in relation to Lowell. As for Ian's needs when he is with Barbara, they were included in the budget Barbara presented to the court. Barbara does not point to any needs of Ian that will not be met when he lives with her as a result of the court's imputation of income to her. This income is available to her and therefore available to meet Ian's needs when he is living with her. We conclude the trial court did not erroneously exercise its discretion in imputing the retirement benefits to Barbara for purposes of child support.[17]

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.

¶ 35.   DYKMAN, P.J. *(dissenting).* In a thirty-six page decision, the trial court explained why it was

[17] Barbara also argues that the use of this formula results in an amount of child support that is unreasonably low and unfair to the child. The trial court's decision states that the "percentage guidelines of HSS–80 is a fair method of calculating child support and both parties have apparently agreed." The record shows that in closing argument Barbara's counsel did agree to this method of computing child support, while not conceding the income figures Lowell used in his computations. Lowell contends we should not consider the unfairness of the percentage guidelines on appeal because the parties stipulated to use of those guidelines. Barbara does not respond to this point in her reply brief. We therefore assume that Barbara did so stipulate, *see Schlieper v. DNR*, 188 Wis. 2d 318, 322, 525 N.W.2d 99, 101 (Ct. App. 1994) (proposition asserted by respondent and not disputed in reply brief may be taken as true), and we do not consider the unfairness of the guidelines on appeal. *See County of Columbia v. Bylewski*, 94 Wis. 2d 153, 171, 288 N.W.2d 129, 138–39 (1980) (we generally do not consider issues not raised in the trial court).

making the property division, maintenance award and child-support payment decisions that it did. The majority identifies these decisions as discretionary. We have often said that we will not disturb discretionary determinations if the record shows that the trial court applied the proper law to the relevant facts and reached a conclusion that a reasonable judge could reach. *See Sharon v. Sharon*, 178 Wis. 2d 481, 488, 504 N.W.2d 415, 418 (Ct. App. 1993). The supreme court explained in *Hartung v. Hartung*, 102 Wis. 2d 58, 66, 306 N.W.2d 16, 20 (1981):

> A discretionary determination, to be sustained, must demonstrably be made and based upon the facts appearing in the record and in reliance on the appropriate and applicable law. Additionally, and most importantly, a discretionary determination must be the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination.

¶ 36. The majority reverses the trial court's property division determination. Why has it done so? Where was the trial court irrational or unreasonable, or where did it use inapplicable law? I will examine the majority's reasons for reversing the trial court to see if they require this result. First, however, I will consider an issue the parties have extensively briefed.

¶ 37. The parties attack and defend the trial court's use of a coverture fraction to determine Barbara's share of Lowell's pension. This debate focuses on the wrong issue. It is relatively unimportant how the trial court reached the figure of $400,300. The significant inquiry is whether that sum, together with other

assets given to Barbara, is a fair property division. In other words, when a trial court varies from the presumptive equal property division of § 767.255(3), STATS., by considering the factors found in that section, are the trial court's reasons for deviating from that presumption rational and reasonable? Thus, although I agree with the majority that a trial court's use of a coverture fraction is permissible, I think its use is dangerous because doing so suggests that the result is automatically correct. In my view, a mathematical method which follows pre-marital contributions to the date of divorce will result in the parties knowing the percent of a pension attributable to pre-marriage contributions plus earnings on that sum. Then, using that information, the real question for the trial court is whether or how far to deviate from the presumptive equal division. In the case before us, I read the majority opinion as questioning the trial court's method and disagreeing with its result. But the majority is clear that it would have reversed regardless of the method used by the trial court to reach its property division. I therefore look to the majority's reasons for reversing to determine if that is the correct result.

¶ 38. The only factor the majority identifies which leads to its result is "the fact that Barbara did not work outside the home during the marriage and before the separation does not justify a deviation from the presumed 50/50 division." The majority also notes that returning Lowell's pre-marriage contributions to his retirement account plus contributions on that amount do not adequately recognize the length of the marriage, Barbara's contributions to it, or the 50/50 presumption.

¶ 39. This appears to be a new standard for reviewing a trial court's discretionary decision. It is

long-established law that we are to look for reasons to sustain a trial court's discretionary decision. *See Brandt v. Witzling*, 98 Wis. 2d 613, 619, 297 N.W.2d 833, 836 (1980). Thus, we are to look at all the reasons a trial court gives for its decision before concluding whether those reasons constitute a proper exercise of discretion. What the majority has done is to look at one of the trial court's reasons, determine that the reason is wrong, and conclude that the property division must be changed upon remand. If this is a new standard of review, the legal problem is that it ignores all of the other reasons the trial court gave, and the other facts that it found. The factual problem with the majority's analysis is that the trial court did not do what the majority claims that it did. The latter issue first.

¶ 40.   The trial court did not base its deviation from the 50/50 presumption on the fact that Barbara did not work outside the home during the sixteen years the parties were together. This is what the trial court found:

> (g)   This was a marriage of moderate length which began when Lowell was 53 years old and was already well established in his profession and career and when he already had acquired a modest estate. At the date of marriage, Barbara was 32 years old and had a college degree, but she had taken few steps to advance a career and had few worldly possessions.
>
> During the marriage, Lowell provided virtually all financial support for the family, which initially included Barbara's child from a former marriage, and later included Ian. Barbara provided a clear preponderance of the homemaking and child-rearing services until the separation in 1994. Lowell chose to work and continues now to still do so, well beyond the usual age of retirement, and Barbara

and Lowell have shared in the benefits of that choice while they resided together and Barbara will most certainly enjoy the sizable increase in the share of Lowell's retirement account that she is awarded by virtue of this judgment.

During the marriage, Lowell paid for Barbara to acquire substantial additional schooling, but she chose not to work, even when her child-rearing responsibilities did not interfere with her ability to do so. In particular, since the parties separated in 1994, Barbara's efforts to secure employment have been unreasonable and so minimal under the circumstances as to suggest that she was not serious in meeting her responsibility to attempt to become self-supporting. Barbara is in good health and is extremely bright and no good cause for her failure to employ these talents has been shown.

¶ 41. We have told trial courts that they should consider both economic and non-economic contributions to a marriage when crafting a property settlement. *See Anstutz v. Anstutz*, 112 Wis. 2d 10, 12, 331 N.W.2d 844, 846 (Ct. App. 1983); *see also* § 767.255(3)(d), STATS. A trial court should no more ignore the fact that one party has made no economic contributions to a marriage than it should ignore the fact that a party did make economic contributions to a marriage. Non-economic contributions are a valuable contribution to a marriage, but they are not necessarily more valuable or of equal value to economic contributions. Section 767.255(3) permits a trial court to alter the presumptive equal property division in a divorce action by considering a number of factors, most of which cannot be quantified. It is unfair and unwarranted to reverse a trial court for commenting on the economic considerations of a dissolving marriage when the legislature and our case law have required it to do

so. By giving discretion to trial judges to decide property division, the legislature has recognized that not all judges will come to the same conclusion, nor place the same weight on the facts they find. Appellate courts are to search for reasons to affirm discretionary decisions, not for reasons to reverse.

¶ 42. The majority's belief that the choice not to work outside the home cannot be considered in a property division has uncertain consequences. Under § 767.255(3), STATS., property is presumed to be divided equally because marriage is a partnership. *See Jasper v. Jasper*, 107 Wis. 2d 59, 67, 318 N.W.2d 792, 796 (1982). In such a partnership, whether one spouse works outside the home while the other cares for the home and any children is irrelevant to a property division, because, though they do so in different ways, each makes a valuable contribution to the marriage. *See Steinke v. Steinke*, 126 Wis. 2d 372, 380–81, 376 N.W.2d 839, 843–44 (1985). However, because partnerships do not necessarily reward each partner regardless of their contributions, § 767.255(3) allows the trial court to deviate from the equal division presumption based on a number of factors. Under § 767.255(3)(d), for example, the trial court can consider "[t]he contribution of each party to the marriage, giving appropriate economic value to each party's contribution in homemaking and child care services." This subsection reflects the fact that one spouse, whether they work in the home, work outside the home, or do a combination of both, may actually contribute more to a marriage than the other spouse.[1]

---

[1] Any number of possibilities arise. One spouse may work outside the home but earn little money and contribute nothing to caring for the house or the children, while the other spouse contributes an extensive amount of house and child-care duties.

¶ 43.  In order to determine whether each spouse contributed equally to their partnership, a trial court must be able to assess whether the fact that one spouse does not work outside the home reflects positively or negatively on his or her contribution to the marriage. Assessing the extent of each spouse's contribution involves value judgments placed on an infinite possibility of factual scenarios.[2] Trial courts should have discretion to consider the nature and extent of all contributions of either spouse to the marriage. Appellate courts should respect that discretion and not substitute their judgment for that of the trial court. *See Zirngibl v. Zirngibl*, 165 Wis. 2d 130, 135, 477 N.W.2d 637, 639 (Ct. App. 1991).

¶ 44.  I believe that the proper appellate analysis is to consider all the factors which would permit a trial court to deviate from the presumptive division, not just one or two, and I will do so. I take the following facts from the record and the trial court's findings.

¶ 45.  Barbara and Lowell were married in 1978. Both had been previously married and divorced. At the time of their marriage, Lowell had obtained M.D. and

One spouse might work outside the home and contribute financially while the other spouse chooses not to work, and neither spouse may contribute to caring for the home. Both spouses might work at jobs with equal pay and time commitments, but only one takes care of the house and children. An example of an unequal property division because of unequal contributions to a marriage is *Sellers v. Sellers*, 201 Wis. 2d 578, 549 N.W.2d 481 (Ct. App. 1996).

[2] In one marriage, a spouse may not work outside the home, but take care of 60% of the house and child-care responsibilities. In another marriage, a spouse may not work outside the home, but take care of 100% of the house and child-care duties, or 80%, or 40%. Must a 40% contribution to house and child-care duties be valued the same as a 100% contribution in all cases?

Ph.D. degrees. He was then a fully tenured professor at the University of Wisconsin and the chair of his department until 1993. Barbara contributed nothing to furthering, enhancing or facilitating Lowell's career. She was disinterested in helping to entertain Lowell's colleagues. Her disdain for them and for scientists in general caused Lowell to be unable to fulfill the usual duties of a department chair and a renowned scientist. She was unwilling to accompany Lowell to professional meetings out of town. The parties had one son, Ian, born in 1984. From then until the parties separated in 1994, Barbara was the primary child rearer, and she was the primary homemaker throughout the marriage, though Lowell spent considerable time with Ian and did a moderate amount of work around the house. Barbara would not do all of the housekeeping chores and Lowell would do those she would not. In addition, Lowell would take Ian to school, and he and Barbara would help Ian with his homework. In the four years of their separation, Barbara has done nothing to or around the house, except to plant some flowers and trim some bushes.

¶ 46.    Lowell assisted Barbara in obtaining two advanced degrees at the University of Wisconsin by financing them and other courses that she took.[3] He assumed that she would work outside the home after

[3] This factor is an example of the problem with the majority's new standard of review. The majority does not consider this factor as one of several reasons for deviating from the presumptive 50/50 property division. Yet, in *Lundberg v. Lundberg*, 107 Wis. 2d 1, 318 N.W.2d 918 (1982) and *Haugan v. Haugan*, 117 Wis. 2d 200, 343 N.W.2d 796 (1984), the supreme court concluded that one spouse's support for the other's education was a significant factor in a marriage, entitling the supporting spouse to compensation by way of property settlement or maintenance.

receiving these degrees. Lowell contributed to the marriage nearly $75,000 of gifts he received from his parents, and he brought over $150,000 in property to the marriage. Barbara brought $2,500 in property to the marriage, and earned about $5,000 during the marriage. At the time of their divorce, Lowell was almost seventy-four years of age, and Barbara was almost fifty-three. Lowell could retire now, but dreads the thought of retirement. He agreed that he is described as someone who will "drop in the saddle." The trial court determined that Lowell had a life expectancy of ten years, and its best estimate was that Lowell would retire in September 2001 at age 77.

¶ 47.  The trial court noted that the asset which so predominated in this case is Lowell's retirement account, which, as of the date of divorce, totaled $1,641,121, and constituted over eighty percent of the marital estate. The trial court considered the unique nature of this asset: it is an asset which has been and is totally unavailable to either party, but is also totally maintenance free. Neither party can receive the principal value of the account, but can only take an annuity which is paid for the lifetime of the party. The principal balance of the account has little meaning. The annuity has annual increases. Though the entire value of the account is a marital asset, Barbara was not married to Lowell and did not contribute to the asset for the first twenty-one years of its existence. More than one-half of its present value was brought to the marriage by Lowell. $75,000 of Lowell's gifted property and $87,000 of the property Lowell brought to the marriage will be divided equally. Barbara will receive $400,300 of the pension, which she can receive in monthly payments of

---

The same is true for other legitimate factors the trial court considered.

$2,246 per month. She will also receive cash and other assets which bring her total property settlement to over $500,000. In addition, Lowell must pay one-half of the debts Barbara incurred after the separation and after a temporary order provided that she pay the debts. Virtually all of the income-producing assets are awarded to Barbara and those awarded to Lowell will probably have to be liquidated to pay Barbara her equalizing payment. This will leave Lowell with some of his pension, $162,000 of equity in a house, his cars and his sick-leave credit. He might never use his sick-leave credit, and it cannot be converted to cash.

¶ 48.   The trial court explained its property division:

> Without any doubt, Barbara made valuable contributions to the marital partnership through her home making and child-care activities. She has, however, been adequately compensated for her contributions.
>
> Now upon divorce, Barbara is being awarded a very generous property division that includes over $500,000 in net value, plus a one-half life interest in the ski chalet; the award of an asset from which she can derive $2,246 per month [plus increases] in income for the rest of her life; and the inclusion of virtually all of her debts in the calculation of the net marital estate even though many were incurred after the separation and after the cutoff date in the temporary order of January 23, 1995, thereby having Lowell paying even more to her support since the separation.
>
> The size of the marital estate from which Barbara is deriving her share of the property division, including the marital portion of Lowell's retirement account, is a product of Lowell's efforts and in this case those efforts must be accorded even greater

weight since his full-time work has continued many years beyond the age at which most people retire.

¶ 49.  The trial court considered that Barbara did not contribute to Lowell's career or education. It noted that Lowell provided Barbara with substantial assistance in obtaining two advanced degrees.

¶ 50.  The trial court considered all of the relevant factors in § 767.255(3), STATS. It is apparent from the transcript of the parties' testimony that the trial court saw more than we can about the value of the services each brought to the marriage. Perhaps the trial court discounted the value of Barbara's contribution to the marriage because it heard evidence that Lowell earned 100% of the family's income and did twenty percent of the child care. Perhaps the trial court discounted the value of Barbara's child-rearing services because they were done for ten years rather than eighteen. Since the parties' separation, each shares those duties equally. If a trial court can value a spouse's contributions to the career of the other spouse, why can it not discount those contributions if the evidence shows that, instead of being helpful in that respect, the spouse contributed disappointment, trouble and embarrassment? Why cannot both financial and homemaking contributions be valued for what they are, and not as one size fits all? Why are sixteen years of services rendered worth more than $500,000? Why cannot a party's unfulfilled expectations about future employment for a newly educated partner be valued? Why cannot the trial court consider that Lowell, because of his dread of retirement, may never see a penny of his pension? In that case, Barbara will receive the overwhelming bulk of the marital estate.

¶ 51.  I cannot say what property division I would have made had I sat as a trial judge in this divorce. But

I am not willing to say that the trial court's decision and reasoning were either irrational or unreasonable, and that is the appellate test. How much more is necessary to transfer the irrational to the rational and the unreasonable to the reasonable? I understand what the trial court did and why it did it. I would accept the trial court's property division as within the proper exercise of its discretion.

## CONCLUSION

¶ 52.   Barbara has received nearly all of the parties' liquid assets, a life estate in a ski chalet, child support of $416 per month for the half-time Ian spends with her, increasing monthly payments of $2,246 per month for the next twelve years while she works outside her home, and in excess of $4,941 per month[4] after that. The trial court concluded that this was "generous." Whether or not this is true, it is not irrational or unreasonable, and that is the appellate test.

¶ 53.   A final note. It has been difficult to determine whether, in my view, the majority has substituted its judgment for that of the trial court, or whether it has set out new tests or rules it then applies to the trial court's property division. I have concluded, however, that except for the impact on the parties, there is no difference. If the former, though the parties are affected, there is no effect on other cases. If the latter, the same is true. If, for instance, the majority has adopted a rule that all contributions of both marriage partners are to be given equal weight, such a rule would not only amend § 767.255(3), STATS., but modify

---

[4] This amount includes: $2,246 in monthly payments for Lowell's pension; $2,045 in social security payments; $400 for Barbara's own estimated pension payments; and $250 in monthly interest on the assets.

a number of our published cases which hold that the trial court is the ultimate arbiter of the weight to be given to items of evidence. *See State v. Higginbotham*, 110 Wis. 2d 393, 405, 329 N.W.2d 250, 256 (Ct. App. 1982). It would also modify *Sellers v. Sellers*, 201 Wis. 2d 578, 595, 549 N.W.2d 481, 487–88 (Ct. App. 1996) and other cases that hold that while "guidelines, rules and structure within which discretion should be exercised can be applied by appellate courts on review, the great burden of reaching a just and fair judgment rests on the trial judge."[5] The supreme court has recently held that the court of appeals does not have the power to overrule, modify or withdraw language from a published opinion. *See Cook v. Cook*, 208 Wis. 2d 166, 189–90, 560 N.W.2d 246, 256 (1997). A court's "power" is its ability to act on cases before it, and implicates the court's jurisdiction. *See P.C. v. C.C.*, 161 Wis. 2d 277, 297, 468 N.W.2d 190, 198 (1991). If a court acts in excess of its jurisdiction, its act is void. *See Kohler Co. v. DILHR*, 81 Wis. 2d 11, 25, 259 N.W.2d 695, 701 (1977). Therefore, if the opinion in this case is intended to modify previous published holdings of this court, that modification is in excess of our jurisdiction and void.

---

[5] In many respects, *Sellers v. Sellers*, 201 Wis. 2d 578, 549 N.W.2d 481 (Ct. App. 1996), has much in common with the case we decide today. In *Sellers*, we affirmed a 75/25 property division, based in part on economic factors. *Id.* at 592–93, 549 N.W.2d at 487.