IN RE the MARRIAGE OF: Diana L. POPP,
Petitioner-Respondent-Cross Appellant,

v.

Richard J. POPP, Appellant-Cross Respondent.

Court of Appeals

*No. 87–0830. Argued July 18, 1988.—Decided October 12, 1988.*

(Also reported in 432 N.W.2d 600.)

779

782

On behalf of the appellant-cross respondent, there were briefs by *Jerome H. Block* of *Bollenbeck, Block, Seymour, Rowland & Samson, S.C.,* of Appleton, and oral argument by *Harvey G. Samson,* of *Bollenbeck, Block, Seymour, Rowland & Samson, S.C.* of Appleton.

On behalf of the petitioner-respondent-cross appellant, there were briefs and oral argument by *Thomas J. Janssen* of *Sigman, Janssen, Stack, Wenning & Sutter* of Appleton.

Before Scott, C.J., Brown, P.J., and Nettesheim, J.

NETTESHEIM, J. Richard J. Popp appeals the property division and attorney fee assessment provisions of a divorce judgment, and Diana L. Popp cross-appeals an order terminating maintenance payments to her. Richard contends that the trial court erred when it: (1) included in the marital estate the value of corporate stocks gifted to him during the marriage; (2) included certain other assets of the gifted corporation in the marital estate; (3) "double counted" certain marital assets; (4) failed to consider his contingent liabilities in the property division; (5) refused to grant a minority discount on the value of marital corporate

stocks; and (6) ordered him to contribute to payment of Diana's attorney fees. In her cross-appeal, Diana contends that the trial court abused its discretion when it ordered termination of maintenance payments to her based upon her cohabitation with a third party following the divorce judgment.

We conclude that the gifted stocks were improperly included in the marital estate as there is no evidence of Richard's donative intent. We also conclude that the hardship determination is not supported by the trial court's present reasoning. Therefore, we reverse the property division provisions of the judgment. We remand for reconsideration of the hardship claim. We find no abuse of discretion as to Richard's other arguments and affirm the judgment on those issues. As to the termination of maintenance payments, we conclude that the trial court did not abuse its discretion and accordingly affirm the order.

## APPEAL

### I. Property Division

During the marriage, Richard received a series of gifts from his father in the form of stock in the family corporation, Popp Cement and Tile Products, Inc. (PCT). Richard did not sell or otherwise convert these gifted stocks and they remain titled solely in his name. Richard's brother, Todd Popp, and the Popp Educational Trust own the remaining shares of PCT. Richard became an employee of PCT prior to receiving any of the gifts of stock and is currently drawing a salary in excess of $65,000 per year as chief executive officer of PCT.

Also during the marriage, Richard used certain PCT moneys to purchase artwork, automobiles, a

canoe, a boat and camera equipment which were kept and used by the family unit. Family vacations were often tied in with business conferences.

Based upon PCT's December 31, 1985 financial reports, the parties stipulated to a valuation of Richard's PCT stock in the amount of $46,314. The net marital estate, including the gifted PCT stock, was valued at $258,299. The court ordered an equal property division to each party, with Richard required to make a balancing payment to Diana. Both Richard and Diana are contingently liable for nearly $2 million of PCT debt.[1] The court considered this contingent liability when including the value of the PCT stock in the marital estate. However, portions of this contingent liability relating to other corporate marital assets were not considered. In addition, the parties had primary liabilities totaling $607,190, all of which were assigned to Richard except for a joint liability of $46,620 on a jointly owned condominium which was ordered sold.

Prior to the divorce judgment, in January of 1986, the parties sold a duplex which had been their homestead. The $49,310 netted from this sale was applied to some of the PCT debt.

During the marriage, Richard became a one-half owner of a Michigan and an Ohio corporation. The parties stipulated that no value would be included in the marital estate for either of these corporations.

---

[1] These debts are also secured with all the business assets of PCT, all titled vehicles of PCT and Popp Trucking, a mortgage interest in the administration building and land owned by PCT, assignments of keyman life insurance policies on Richard and Todd Popp and a second mortgage on Richard's homestead. Both Richard and Todd have also pledged their interest in PMP Trenching stock as collateral.

Richard also became a partner in Popp Trucking and a one-third owner of PMP Trenching during the marriage. The parties agree that Richard's interest in both of these companies was properly included in the marital estate. However, Richard testified that his interest in PMP Trenching is "$104,000, subject to discount for minority stockholder." The trial court refused to permit the requested discount when it included the value of Richard's interest in PMP Trenching in the marital estate.

## A. Gifted PCT Stocks

### 1. *Character and Identity*

■

Generally, a property division rests within the sound discretion of the trial court. *Brandt v. Brandt,* 145 Wis. 2d 394, 406, 427 N.W.2d 126, 130 (Ct. App. 1988). An exercise of discretion premised upon factual or legal error constitutes an abuse of discretion. *Id.*

Richard contends that the trial court erred when it ruled that his gifted PCT stock had been transmuted to marital property. This ruling was based upon the court's finding that: (1) PCT was the "alter ego" of Richard; (2) the personal and corporate assets were thoroughly commingled; and (3) the use of "before tax" dollars generated a higher standard of living for the family.

■

The burden of proof rests with Richard to show to a reasonable certainty by the greater weight of the credible evidence that the stocks were gifted. *Id.* at 407–08, 427 N.W.2d at 131. The record unequivocally indicates that the stocks in question were gifted to

Richard by his father. Therefore, the first prong of this test has been met by Richard.

We must then consider whether the trial court correctly concluded that the character and identity of this property had not been preserved. This burden lies with Diana. *Id.* at 408–09, 427 N.W.2d at 131. Whether a party has met the burden of proof is a question of law which we examine without deference to the trial court's conclusions. *Id.* at 409, 427 N.W.2d at 131.

Identity inquires "whether the gifted or inherited asset has been preserved in some present identifiable form such that it can be meaningfully valued and assigned." *Id.* at 411, 427 N.W.2d at 132. We view an identity determination as a conclusion of law dependent upon underlying factual findings.[2] Whether the facts as determined fulfill a legal conclusion presents a question of law which we review *de novo. Oshkosh N.W. Co. v. Oshkosh Library Bd.,* 125 Wis. 2d 480, 485, 373 N.W.2d 459, 462 (Ct. App. 1985). Moreover, the evidence on this question is undisputed and thus a question of law is presented; we are not bound by the trial court's resolution of such an issue. *Id.* Richard's gifted stocks are clearly identifiable, having remained titled solely in his name, and were readily valued. We

[2]Certain of our language in *Brandt v. Brandt,* 145 Wis. 2d 394, 427 N.W.2d 126 (Ct. App. 1988), suggests that an identity determination presents a question of fact. "We view a tracing or commingling determination by a trial court as presenting a question of fact." *Id.* at 407, 427 N.W.2d at 130. In making this statement, we were alluding to the trial court's recital of the historical commingling activities of the parties. We were not alluding to the legal conclusion of identity resulting from those historical facts.

are thus satisfied that their identity has been preserved.

Character, on the other hand, addresses the manner in which the parties have chosen to title or treat gifted or inherited assets. *Brandt,* 145 Wis. 2d at 410, 427 N.W.2d at 132. As with identity, we view a character determination as a conclusion of law dependent upon underlying factual findings. Again, this presents a question of law which we review *de novo. Oshkosh N. W.,* 125 Wis. 2d at 485, 373 N.W.2d at 462.

Transmutation of non-marital property to marital property can occur when the character of such property is changed. *Brandt,* 145 Wis. 2d at 410, 427 N.W.2d at 132. Donative intent of the owner of the exempt property is an issue when deciding whether the character of the property has been changed. *Id.* at 410–11, 427 N.W.2d at 132; *see also Wierman v. Wierman,* 130 Wis. 2d 425, 429, 387 N.W.2d 744, 746 (1986).

Diana does not dispute that Richard maintained title of the stocks solely in his name. She argues, however, that the character of the gifted stock has been changed due to Richard's application of certain corporate assets for marital purposes and the parties' pledging of certain marital property as collateral for PCT corporate debts.

We disagree with the trial court's conclusion that these facts constitute transmutation of Richard's gifted PCT stocks from exempt property to marital property. Richard's decision to apply certain corporate assets for marital purposes or to utilize corporate moneys for the purchase of marital items may well serve to transmute those individual items (a matter to

788

be addressed in a latter portion of this opinion). However, these actions do not operate to transmute the *entire* corporation into a marital asset if the identity and character of the shares have been preserved.

Although this is a character issue, the situation here is akin to the identity issue in *Brandt*. There the inheriting party, resisting a commingling argument, claimed that she had successfully preserved the identity of her inherited assets. *See Brandt,* 145 Wis. 2d at 411, 427 N.W.2d at 132. We observed, "Were these transactions limited to withdrawals, a commingling problem would not be present since the account, although diminished, would still consist of inherited assets." *Id.* at 413, 427 N.W.2d at 133. Here, although Richard may have changed the character of *certain* limited assets of the exempt corporation, thereby rendering them marital property and diminishing the assets of the corporation accordingly, the corporate entity as represented by the gifted shares remained unchanged in its identity and character.

Regardless of the manner in which Richard managed the corporate and family finances, there is no evidence that the PCT stock was transmuted. Nor is there any evidence of the requisite donative intent (actual or constructive) on Richard's part. *See id.* at 410–11, 427 N.W.2d at 132. Richard kept the stocks titled solely in his name and did nothing which expressly or impliedly indicated that he wished or intended to gift these shares to Diana or convert them to marital property.

Diana's agreement to accept contingent liability for the PCT debts does not change our thinking in this regard. As noted, a character analysis addresses the manner in which the parties have titled or treated the

*exempt* asset. As such, the inquiry properly focuses on the exempt asset—not other assets which may have been pledged as collateral against debts incurred by the exempt entity. Such matters may well bear upon a hardship claim; an issue which we will discuss later. However, for purposes of this issue, the evidence reveals no acts by Richard which suggest that an actual or constructive gift of these exempt shares to Diana was intended.

The trial court found that Richard exercised the powers *derived from* his stock ownership to financially benefit the marital and family unit. This resulted, the court concluded, in a transmutation of the PCT stock. We have no quarrel with the court's factual findings. However, we disagree with its conclusion.

We conclude that the exercise of powers derived from exempt property for the benefit of a marital or family unit does not serve to transmute the underlying exempt property to marital property. Were the law otherwise, every gifted or inherited business entity would be transmuted to marital property where the financial benefits acquired therefrom were applied for the well-being of the marital unit. Rather, the law is that the character of the *exempt property itself* must be changed in some way. *Id.* at 410, 427 N.W.2d at 132. Therefore, we conclude that the trial court erred when it concluded that Richard's gifted PCT stocks had been transmuted to marital property.

## 2. *Hardship*

The trial court also determined that a failure to include the exempt PCT stock in the marital estate

would work a hardship upon Diana. Richard appeals this determination. The court reasoned:

> [T]he life style and standard of living of the parties became so inextricably bound up in the methods by which [Richard] managed the economics of the marriage, that to not include the value of the PCT stock would work a hardship upon [Diana] by depriving her of the economic benefit of her many years of contribution to the family unit in the form of housekeeping, consortium, and child care.

Gifted and inherited property may be subject to division if hardship is found. Sec. 767.255, Stats. Hardship is a discretionary finding which we will affirm if there is any reasonable basis for it. *Asbeck v. Asbeck,* 116 Wis. 2d 289, 295, 342 N.W.2d 750, 753 (Ct. App. 1983). The proper exercise of discretion requires a reasoning process dependent upon the facts in, or reasonable inferences from, the record and a conclusion based upon proper legal standards. *Id.* at 293, 342 N.W.2d at 752–53.

In *Asbeck,* we observed that "hardship is an indefinite concept which will depend upon the circumstances of an individual case." *Id.* at 294, 342 N.W.2d at 753. "The finding of hardship must depend upon the varying considerations in each individual case. Hardship in one case may not be hardship in another case." *Id.* at 296, 342 N.W.2d at 754. This language is very general. Since *Asbeck,* we have considered fashioning a more definite rule, noting that hardship issues are appearing with regularity in family law cases. We now conclude that a more specific rule is desirable and necessary.

We start with the well-accepted proposition that "[t]he division of property of the divorced parties rests upon the concept of marriage as a shared enterprise or joint undertaking." *Lacey v. Lacey,* 45 Wis. 2d 378, 382, 173 N.W.2d 142, 144 (1970); *see also Wierman,* 130 Wis. 2d at 439, 387 N.W.2d at 750. As such, the division of *marital* property rests upon principles of equitable distribution. *Id.* Gifted and inherited property, however, *is not marital property.* Even if divided under hardship principles, such property remains non-marital. *Brandt,* 145 Wis. 2d at 417, 427 N.W.2d at 134. "Such a finding [of hardship] does not alter the non-marital status of such property; it merely permits its division." *Id.* Therefore, a determination to utilize exempt assets in a property division rests not upon equitable or fairness principles, but rather, as the legislature has decreed, upon hardship principles.

The dictionary defines hardship, in part, as "privation" or "difficulty." *Webster's Third New International Dictionary* 1033 (1976). Adopting this definition, we conclude that the party claiming hardship must demonstrate that a failure to include the exempt assets in the marital estate will result in a condition of financial privation or difficulty. As we noted in *Asbeck,* whether a hardship exists will depend upon the varying considerations in each individual case. *Asbeck,* 116 Wis. 2d at 296, 342 N.W.2d at 754. A hardship determination must therefore be made in light of the facts and history of the case and the relative financial circumstances of the parties before and after the divorce. We reaffirm our statement in *Asbeck* that this consideration is not limited to essen-

tial needs only. *Id.* The burden on this question is properly assigned to the party claiming hardship.

Here, although the trial court explained its hardship ruling, we are not satisfied that the court's conclusion of hardship was a logical derivation from the considerations it articulated.

As a basis for its finding of hardship, the trial court stated that Diana's standard of living would be affected and she would be deprived of the economic benefit of her years of contribution to the family unit in the form of housekeeping, consortium and child care. Here, each party was awarded an equal share of a substantial marital estate. In addition, Richard was assigned responsibility for nearly all of the parties' primary liabilities, totaling in excess of $600,000.

While the reasons noted by the trial court undoubtedly make the hardship ruling fair, they do not reveal that inclusion of the exempt assets is necessary to eliminate or alleviate a financial difficulty or privation which would otherwise exist if the property division were limited to the marital property.

Diana argues that her contingent liability for PCT debts also serves as a proper basis for the finding of hardship. We disagree. Our supreme court has held that contingent liabilities that may never be paid need not be deducted in determining net worth. *Wahl v. Wahl,* 39 Wis. 2d 510, 524, 159 N.W.2d 651, 659 (1968), *overruled on other grounds, O'Connor v. O'Connor,* 48 Wis. 2d 535, 541, 180 N.W.2d 735, 739 (1970). Absent evidence that such liability is imminent or likely, its consideration strays into the realm of speculation and mere theory. *See Ondrasek v. Ondrasek,* 126 Wis. 2d 469, 480, 377 N.W.2d 190, 194 (Ct. App. 1985) (holding that discounting the value of real estate for capital gains tax was improper where the evidence did not

reveal that a sale was imminent and the judgment did not require a sale of the property).

Here, the evidence does not reveal any basis for concluding or inferring that the parties' contingent liability as guarantors of PCT's debt is imminent or likely. As such, it is a mere possibility. Because of the speculative nature of this liability, it cannot be used as a basis for a finding of hardship.

Accordingly, we reverse the trial court's determination that the value of the PCT stock be included in the marital estate under the court's present reasoning. Upon remand, the court shall reexamine Diana's hardship claim in light of the burden assigned to her under the test adopted herein.[3]

## B. Transmutation of Specific PCT Property

Richard next argues that the trial court erroneously ruled that certain specific items of exempt PCT property were transmuted to the marital estate. As noted earlier, such a determination is a legal conclusion based upon underlying factual findings.

[3]Diana also contends that the gifted PCT stocks were properly included in the marital estate under "equitable distribution—partnership" theory. She argues that the increased value of the PCT stock during the marriage is attributable to the efforts and abilities of Richard as shareholder and chief executive officer of the corporation. She urges us to find that appreciation in the value of gifted or inherited property due to the efforts of the owning spouse renders the gifted property part of the marital estate. We decline to address this issue because even if we were to expand the law as Diana argues, this record is devoid of any evidence as to the reason for any appreciation of the PCT stock, assuming it has so appreciated.

Richard contends that $9745 of the $19,140 worth of artwork included in the marital estate was paid for with corporate funds. As such, Richard contends that this portion of the artwork is exempt property.

We first note that if Richard's testimony that certain of this artwork was purchased with PMP Trenching funds is correct, there can be no transmutation because the shares of PMP were not gifted or inherited. We further note, however, that certain other evidence indicates that over $4000 worth of checks were issued from the exempt PCT account to Ducks Unlimited to purchase certain artwork. Thus, a transmutation issue as to a portion of this personal property is arguably made.

Diana testified that most of the artwork was displayed in the parties' home. Richard argues that the record is unclear as to whether the various pieces of artwork were displayed in the home or the corporate offices.[4] In light of this uncertainty, Richard argues that the trial court abused its discretion by including all of the artwork in the marital estate. We disagree and affirm the trial court's determination that all $19,140 of the artwork is marital.

The burden of demonstrating the exempt status of gifted property is upon the party making such a claim.

___

[4]As to Richard's argument that even those prints which hung in the family home remained exempt if they were purchased with exempt PCT funds, we conclude that the trial court could properly determine that by hanging the artwork in the marital home, Richard converted it to marital property. *See Trattles v. Trattles,* 126 Wis. 2d 219, 226, 376 N.W.2d 379, 383 (Ct. App. 1985) (holding that the use of exempt property to purchase items for the mutual enjoyment and use of both parties to a marriage can constitute transmutation).

*See Brandt,* 145 Wis. 2d at 408, 427 N.W.2d at 131. The uncertainty of the record here is not due to any trial court error. Rather, the obligation lies with Richard to provide the court with an informed record on this question. While certain evidence reveals that some of the artwork was purchased with exempt corporate moneys, it is impossible to discern which items of artwork were purchased with exempt assets and which were purchased with non-exempt assets. Richard has therefore failed to identify with requisite certainty the property he claims is exempt. *See id.* at 407–08, 427 N.W.2d at 131. He cannot be heard to complain that the trial court abused its discretion when he leaves the court in this evidentiary vacuum. *See Laribee v. Laribee,* 138 Wis. 2d 46, 52–53, 405 N.W.2d 679, 682 (Ct. App. 1987).

### C. "Double-Counting"

Richard next asserts that the trial court "double-counted" the $49,310 from the sale of the duplex by first including it in the valuation of PCT, and then also listing it as a separate marital asset. The evidence indicates that the full $49,310 was applied to the PCT debt *after* the duplex was sold in January of 1986. The valuation of PCT was, however, taken from the December 31, 1985 financial reports which were prepared before the sale. Therefore, there was no double-counting of this asset. We find no abuse of discretion as to this issue.

### D. Contingent Liabilities

Richard complains that the trial court improperly excluded his contingent liabilities for the Michigan

and Ohio corporations when it determined the value of the marital estate. The parties stipulated that no value would be included in the marital estate for either of these corporations.

At trial, however, Richard stated that there was a contingent liability related to these two corporations. However, he did not know the amount of this liability. Here again, the evidentiary vacuum created by Richard's own vagueness on this question does not entitle Richard to argue the trial court's ruling on appeal. *Id.* Moreover, as noted earlier, the trial court is not required to consider contingent liabilities that may never be paid. *Wahl,* 39 Wis. 2d at 524, 159 N.W.2d at 659. Whether these contingent liabilities would ever come due is so speculative on the basis of this record that we cannot conclude that the trial court abused its discretion in excluding them from the marital estate.

### E. Discount Factor for Minority Status

Richard's final property division claim is that he should have received a 20% discount on the value of PMP Trenching because of his minority position and the nonmarketability of the stock. The trial court refused to discount the corporation's value, stating that "there is no sale contemplated and the value was determined by book value."

Valuation of a close corporation is discretionary and will not be disturbed on appeal unless it is contrary to the great weight and clear preponderance of the evidence. *Dean v. Dean,* 87 Wis. 2d 854, 876, 275 N.W.2d 902, 912 (1979). The evidence reflects the book value of the stock. The only evidence going to a

discount factor was Richard's testimony that his certified public accountant told him that a 20% to 40% discount was in order. While a party is competent to give opinion evidence as to the value of his own property, *Arneson v. Arneson,* 120 Wis. 2d 236, 252, 355 N.W.2d 16, 23 (Ct. App. 1984), we are unaware of any case which has extended this rule to the sophisticated area of fixing a discount factor to stock holdings representing a minority position. There is no expert opinion which contradicts the book value of the stock. Therefore, we affirm the trial court's valuation of PMP Trenching.

## II. Attorney Fees

Richard contends that the trial court abused its discretion when it ordered him to make an $11,500 contribution to Diana's attorney fees. This award is within the sound discretion of the trial court and will be affirmed absent an abuse of discretion. *Ondrasek,* 126 Wis. 2d at 483, 377 N.W.2d at 196. When making the decision to award attorney fees, the trial court must take into consideration the reasonableness of the fee, the need of the spouse requesting contribution, and the ability of the other spouse to pay. *Holbrook v. Holbrook,* 103 Wis. 2d 327, 343, 309 N.W.2d 343, 351 (Ct. App. 1981). Richard asserts that the trial court did not make these required findings.

The judgment of divorce merely states that $11,500 of Diana's attorney fees are to be paid by Richard, without any finding as to the three factors articulated in *Holbrook.* However, the record also indicates that on reconsideration of the decision awarding these attorney fees, the trial court made

798

further findings as to the reasonableness of the fees, Diana's need, and Richard's ability to pay. Specifically, the trial court found that Richard "has had, and does now have, the ability to pay the attorneys' fees contribution required under the divorce Judgment and amendment thereof." The trial court then went on to state that, despite neither party having funds available to pay attorney fees, Richard has cash flow and Diana does not. The court also reviewed the itemized statement of Diana's attorney, considered the charges to be reasonable, and then increased Richard's contribution by another $2500.

We are satisfied that these later findings are relevant to the trial court's exercise of discretion in the earlier divorce judgment, since it effectively reconsidered its earlier attorney fees award and then increased the award. Therefore, we conclude that the court properly exercised its discretion and affirm the award of $11,500 plus $2500 of attorney fees.

## CROSS-APPEAL

### I. Maintenance

Diana cross-appeals the order terminating maintenance. Diana has a bachelor's degree and taught French until her first child was born in 1973. She then stopped working outside the home and performed the duties and obligations of homemaker and mother for the family unit during the remainder of the marriage. Three children were born to the parties during the marriage.

While the divorce was pending, Diana was employed off and on. She had a temporary teaching position during the fall of 1985. At that time Diana

and the children were awarded temporary family maintenance of $1100 monthly. In the spring term of 1986, Diana was unemployed. During the summer of 1986, she went to school to renew her teaching license. Also during that summer, physical custody of one of the children was transferred to Richard, while his family maintenance obligations to Diana remained the same.

On July 24, 1986, the judgment of divorce was granted, awarding Diana $2600 per month family support. In making its family support award, the trial court took into account the respective earning capacities of the parties, the standard of living enjoyed during the marriage, the split custody arrangement, the parties' obligation to support their children, the tax ramifications, and the fact that the property awarded to Diana could produce income of $400 per month. Of this $2600 per month award, the court designated $1200 for spousal maintenance. The trial court also determined the spousal maintenance should be reduced to $400 per month on September 30, 1987, or when Diana obtained a full-time job, whichever occurred first.

In the fall of 1986, Diana was once again temporarily employed. On November 29, 1986, Diana and the two children in her custody moved into the home of a third party, Diana's fiance. During the spring and summer of 1987, Diana was unable to obtain employment and continued living in her fiance's home.

In February of 1987, Richard requested the trial court to reduce or terminate Diana's maintenance based upon her cohabitation with a third party. On June 4, 1987, the court ordered that maintenance to Diana be terminated, effective January 28, 1987. Diana cross-appeals this order, requesting mainte-

nance from January 28, 1987 to the date of her remarriage, September 19, 1987.

Maintenance determinations are left to the discretion of the trial court and will not be disturbed on appeal unless there is an abuse of discretion. *La-Rocque v. LaRocque,* 139 Wis. 2d 23, 27, 406 N.W.2d 736, 737 (1987). The exercise of discretion is not the equivalent of unfettered decision-making. *Id.* A discretionary determination must be the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination. *Id.* Additionally, maintenance payments can be modified only upon a finding of change in the financial circumstances of the parties and not solely on the basis of the receiving spouse's cohabitation with a third party. *Van Gorder v. Van Gorder,* 110 Wis. 2d 188, 199, 327 N.W.2d 674, 679 (1983).

The trial court made extensive findings of fact relative to Richard's motion to reduce or terminate maintenance. None of these in our judgment is clearly erroneous. *See* sec. 805.17(2), Stats. Diana and her fiance lived in a "marriage-like relationship" in the house purchased in anticipation of their marriage. Pursuant to an "unwritten, unspoken agreement," Diana's fiance provided housing, utilities, entertainment, food as needed, and gifts for the two children and Diana. Diana paid for groceries and her automobile and insurance expenses and performed housework for the group.

*Van Gorder* expresses two underlying concerns that arise when a former spouse cohabits while continuing to receive maintenance payments. First,

where the cohabitation does enhance the recipient's financial condition, payments that are no longer needed for support should not have to be made. *Van Gorder,* 110 Wis. 2d at 197, 327 N.W.2d at 678. And second, cohabitors should not be able to fashion their relationship and finances in a manner that is intended solely to prevent the modification of maintenance payments. *Id.* at 197, 327 N.W.2d at 678–79. As to this latter concern, the trial court expressly found that the cohabitation had not been fashioned in order to prevent the cessation of maintenance.

As to the former *Van Gorder* concern, Diana first asserts that the trial court failed to make a finding that her actual financial condition had improved sufficiently to justify termination of maintenance. However, the court's decision specifically states that Diana's financial condition had been enhanced due to her cohabitation such that maintenance should be modified.

██

Assuming this finding was made, Diana then attacks it as erroneous. We reject this argument. As noted, the trial court found that Diana's fiance provided financial assistance in many areas which had formed the basis for the earlier award of maintenance. Based upon these facts, the court correctly determined a change in circumstances had occurred warranting a modification of the maintenance award. These factual findings are not clearly erroneous. *See* sec. 805.17(2), Stats.

Additionally, Diana contends that the cohabitation was necessitated by her inability to support herself and the two children on the temporary maintenance. This implies that her fiance was forced to support her because Richard would not, thus render-

ing it error to consider this "forced" cohabitation as enhancing her financial situation. We disagree. While the motive for cohabitation is relevant, it remains but a factor among many for the court to consider when addressing a motion for maintenance modification or termination due to alleged changed circumstances resulting therefrom.

Costs are not awarded to either party.

*By the Court.*—Judgment affirmed in part, reversed in part and cause remanded. Order affirmed.