In re the Marriage of:

Patricia A. Finley, Petitioner-Respondent-Cross-Appellant,

v.

James J. Finley, Respondent-Appellant-Cross-Respondent.

Court of Appeals

*No. 01–1705. Submitted on briefs February 12, 2002.—Decided May 30, 2002.*

2002 WI App 144

(Also reported in 648 N.W.2d 536.)

509

510

On behalf of the respondent-appellant-cross-respondent, the cause was submitted on the briefs of *John H. Short* of *Vance, Wilcox, Short & Short, S.C.*, Fort Atkinson.

On behalf of the petitioner-respondent-cross-appellant, the cause was submitted on the briefs of *J. Paul Neumeier, Jr.* and *Raymond E. Krek* of *Krek & Associates, S.C.*, Jefferson.

Before Vergeront, P.J., Roggensack and Lundsten, JJ.

¶ 1. VERGERONT, P.J. James Finley appeals the judgment of divorce from Patricia Finley challenging the award of maintenance to Patricia, certain restrictions on the electrical work he may do outside of his full-time job, and certain aspects of the property division. Patricia cross-appeals contending that the circuit court erroneously exercised its discretion in not imputing to James income from moonlighting work based on his past moonlighting, and erred in several other rulings in setting maintenance, in dividing the property, and in setting child support.

¶ 2. We conclude the court properly exercised its discretion in deciding not to impute income to James based on his past moonlighting work and in awarding Patricia $50 a month in maintenance. However, we are unable to determine whether the court properly exercised its discretion in ordering that James pay 50% of his net profits from moonlighting to Patricia as maintenance and in restricting the moonlighting work James may do for free. With respect to the other challenges on the appeal and cross-appeal, we conclude the court committed no errors of law and properly exercised its discretion. We therefore affirm in part, reverse in part, and remand.

## BACKGROUND

¶ 3. James and Patricia were married on March 31, 1978, and were fifty-five and forty-six, respectively,

at the time of the divorce hearing. They had three children, who at the time of the divorce hearing were twenty-one, eighteen, and fifteen. The fifteen-year-old child was living with Patricia, and the parties stipulated to joint legal custody and primary placement with Patricia.

¶ 4. When they married, both Patricia and James had high school diplomas; Patricia had also completed three years of nursing school, receiving a registered nurse diploma. Patricia worked steadily during the marriage at Watertown Memorial Hospital, her hours and assignments varying over the years. The court found that at the time of the divorce, she was working in the surgery unit, three eight-hour days per week and an additional sixteen hours per week on call. Her pay was $20.61 per hour for the hours she worked, plus an additional $1.75 per hour for being on call even if she did not go into work. The court found her income to be $35,000 per year. James is a journeyman electrician and earns $19 per hour at Wilke Electric. In addition, he had a long history of doing electrical work on the side, mostly for cash. The parties stipulated that James had averaged 624 hours per year in moonlighting work. The court found that some of that work was on the parties' residence. James testified that at the time of the divorce he was not doing any moonlighting. The court found his income from his employment at Wilke Electric to be $45,018 in 1999, and found there was no reason to expect his income to decrease in 2000 or 2001. To that figure, the court added $500, finding that James earned that additional amount per year selling scrap copper wire.

¶ 5. The issues of maintenance, child support, and certain aspects of the property division were tried to the court. In determining James's income for purposes of

518

maintenance and child support, the court did not impute income to James for moonlighting. The court ordered James to pay 17% of $45,518 in child support, rejecting Patricia's argument that he should pay more because he spent very little time with their minor child.

¶ 6. In determining Patricia's income for the purpose of maintenance, the court used her current earnings, finding that they reflected her earning capacity. With respect to Patricia's expenses, the court found certain ones to be excessive. It also eliminated monthly payments on a lease for a new car for their middle son, finding that Patricia unilaterally made that decision and their son already had the use of a car that was adequate. The court did not include in her budget college savings for the two younger sons. The court ordered James to pay Patricia $50 per month in maintenance.

¶ 7. With respect to any future moonlighting James did, the court ordered James to pay on a semi-annual basis 50% of the net profits to Patricia as maintenance. It imposed detailed recording and reporting requests and also prohibited James from doing any moonlighting work for free other than for his parents, siblings, spouse, and children, and only then on property owned by that family member. The judgment provided that if the court obtained information that James did any moonlighting work or received any form of compensation for moonlighting work which was not reported as required, the court would request the district attorney's office to initiate prosecution for criminal contempt.

¶ 8. The court awarded an equal division of the marital estate, with each party receiving approximately $170,935.50 worth of property; this required an equal-

izing payment from James of $13,582.50.[1] The court rejected James's contention that his equitable IRA account should be excluded from the property division as inherited property; it also rejected Patricia's requests that she receive a credit for post-separation contributions to her retirement account and that the car lease obligation be divided.

## DISCUSSION

¶ 9. The division of the marital estate, the decision whether to award maintenance, and, if so, how much, and the amount of child support are all committed to the circuit court's discretion. *Hokin v. Hokin*, 231 Wis. 2d 184, 190, 605 N.W.2d 219 (Ct. App. 1999). We affirm a circuit court's discretionary decision if the court applies the correct legal standard to the facts of record and in a reasoned manner reaches a rational result. *Id.* We accept all findings of fact made by the circuit court unless they are clearly erroneous. WIS. STAT. § 805.17(2) (1999–2000).[2]

## I. Maintenance

¶ 10. In deciding whether to award maintenance, and, if so, for how long and in what amount, the court is to consider the factors in WIS. STAT. § 767.26,[3] which

---

[1] The parties' martial residence was for sale, and they had equity in it of $140,000, which was to be divided equally and was included in the property division.

[2] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

[3] WISCONSIN STAT. § 767.26 provides as follows:

are designed to further two objectives: support and fairness. *Hokin*, 231 Wis. 2d at 200–01. The former ensures the spouse is supported in accordance with the needs and earning capacities of the parties; the latter

---

**Maintenance payments**. Upon every judgment of annulment, divorce or legal separation, or in rendering a judgment in an action under s. 767.02 (1)(g) or (j), the court may grant an order requiring maintenance payments to either party for a limited or indefinite length of time after considering:

(1) The length of the marriage.

(2) The age and physical and emotional health of the parties.

(3) The division of property made under s. 767.255.

(4) The educational level of each party at the time of marriage and at the time the action is commenced.

(5) The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, custodial responsibilities for children and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.

(6) The feasibility that the party seeking maintenance can become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and, if so, the length of time necessary to achieve this goal.

(7) The tax consequences to each party.

(8) Any mutual agreement made by the parties before or during the marriage, according to the terms of which one party has made financial or service contributions to the other with the expectation of reciprocation or other compensation in the future, where such repayment has not been made, or any mutual agreement made by the parties before or during the marriage concerning any arrangement for the financial support of the parties.

(9) The contribution by one party to the education, training or increased earning power of the other.

(10) Such other factors as the court may in each individual case determine to be relevant.

521

ensures a fair and equitable arrangement between the parties in each individual case. *Id.*

¶ 11. James contends the circuit court erroneously exercised its discretion in awarding maintenance because: (1) it used Patricia's actual earnings rather than what she could earn if she worked full time; (2) it based the award of $50 a month solely on the disparity in the parties' incomes; (3) it provided no rationale for splitting his net profits from moonlighting 50/50; and (4) the effect of the order on future moonlighting is to prescribe how he may use his free time. Patricia, on the cross-appeal, contends the court erroneously exercised its discretion by: (1) not imputing moonlighting income to James; (2) not including in her budget the lease payment for the new car for their middle son; (3) not including in her budget college savings for their two younger sons; and (4) not ordering maintenance retroactive to the date of the temporary order. We address related issues together, rather than separating them by appeal and cross-appeal.

*James's and Patricia's Earning Capacities*

■

¶ 12. Each party argues that the court should impute income to the other because the other is not working at earning capacity. The court may consider a party's earning capacity rather than actual earnings when determining a party's obligation for maintenance and child support, *Sellers v. Sellers*, 201 Wis. 2d 578, 587, 549 N.W.2d 481 (Ct. App. 1996); and the earning capacity of the party seeking maintenance is a factor to consider in awarding maintenance, WIS. STAT. § 767.26(5).

522

¶ 13. We conclude the circuit court properly exercised its discretion in basing maintenance on Patricia's actual earnings, rather than what she could earn if she worked forty hours every week. The court determined that she was not shirking and was working at her earning capacity. The court found she was working an amount consistent with what she had done in the past, and it credited her testimony that she felt this was all she could handle. Patricia testified that she did not believe she could work more hours given her responsibilities at home, the stress of working in the surgery unit, and her depression, for which she was taking medication. The court's decision on this point was supported by the record and was reasonable.

¶ 14. Similarly, we conclude the circuit court properly exercised its discretion in not imputing income to James for moonlighting work. James testified that he was no longer doing moonlighting at the time of the divorce, giving as reasons that he had more domestic chores to do since he was living by himself and he was visiting a sister who was ill. He also indicated he did not want to have to share moonlighting income, but said even if he did not have to share it, he did not know if he would do it any more. The court carefully considered Patricia's arguments that it should impute moonlighting income to James, and it gave a number of reasons for its decision not to do so: James's age of fifty-five; his testimony that he was beginning to feel the physical effects of his age; the physical requirements of his regular job; the forty-five hours per week he already worked; his new domestic tasks; Patricia's work week of less than forty hours a week; the substantial property division; the sufficiency of Patricia's income and

James's regular income to meet their reasonable expenses; and the court's decision not to award James's equitable IRA to him as separate property. The court found that James was not shirking by working forty-five hours a week and was working at his earning capacity at his regular employment.

¶ 15. Patricia argues that the court's determination that James is not shirking is wrong because his testimony shows that he is not doing any more moonlighting because he does not want to have to pay any of that income to her. While the court noted that testimony, it also credited other reasons James gave for not moonlighting, and decided they were reasonable. *See Sellers*, 201 Wis. 2d at 587 (defining "shirking" as an employment decision that is both voluntary and unreasonable under the circumstances). The reasons for the court's decision not to impute income to James are supported by the evidence and are a logical basis for the court's decision.

*Fixed Sum Maintenance to Patricia*

■

¶ 16. We next consider James's contention that the court's decision to award $50 a month in maintenance was impermissibly based solely on the disparity between his income and Patricia's. We do not agree this was the sole basis.[4]

---

[4] In support of this argument, James focuses on the court's comment that, "in the absence of child support the Court would be ordering indefinite maintenance sufficient to equalize the incomes of the parties," and the court's comment that, when child support ends the court "would likely grant [an increase in maintenance if Patricia seeks that] . . . to equalize the incomes

¶ 17. The court analyzed many of the statutory maintenance factors in the context of its discussion on property division: the court considered this a long-term marriage; it made findings on the parties' ages and incomes; it found that Patricia had symptoms of depression that were now controlled by medication, and she had been able to and was still working as a nurse; it found that James complained of soreness in his hands and shoulders, but this did not at this point restrict his employment; it found neither party contributed to the education or increased earning capacity of the other; and it found that each had contributed fully to the marriage—Patricia as the primary child-care provider and James as the primary breadwinner. The court then began its discussion of maintenance by stating:

> Just as the property division factors weighed in favor of a 50/50 property division, the maintenance factors also weigh in favor of maintenance. However, at this point the Court needs to compare the monthly disposable incomes of the parties to their budgets to see whether at this point either party is really in a position to need or to pay maintenance.

In order to determine the needs of each party, the court then analyzed the budgets of each, making adjustments when it considered items unreasonable. Finally, it considered the child support that James would be paying Patricia. Without maintenance, the court found that Patricia and the minor child would have $2,840 a month in disposable income, and James would have $2,074; by

of the parties consistent with *LaRocque v. LaRocque*[, 139 Wis. 2d 23, 406 N.W.2d 736 (1987)]. However that will again depend on the facts presented at that time." We consider it more relevant to analyze what the court actually did, rather than focus on comments indicating what it would have done in another situation or might do in the future.

ordering $50 a month in maintenance, the court increased Patricia's monthly disposable income, for herself and one child, to $2,879, leaving James with $2,042 monthly disposable income for himself.

¶ 18. We conclude the court's decision to award $50 in maintenance reflects an application of the appropriate statutory factors and the objectives of maintenance to the facts of this case.

*James's Future Moonlighting*

¶ 19. Although the court did not impute any moonlighting income to James and did not require that he work in addition to his job at Wilke Electric, the court ordered him to pay 50% of the net profits of all income he earned from moonlighting to Patricia on a semi-annual basis as maintenance. James objects on the ground that the court did not explain its rationale for that decision. The court did refer to a desire to equalize the parties' income, given the length of the marriage, but did not otherwise explain the 50/50 split of the moonlighting income. As James points out, and Patricia implicitly acknowledges, although an equal division of income is a starting point when considering maintenance in a long-term marriage, the circuit court must proceed from there to analyze the statutory factors. *Kennedy v. Kennedy*, 145 Wis. 2d 219, 222–23, 426 N.W.2d 85 (Ct. App. 1988). When the circuit court does not explain its reason for a discretionary decision, we may search the record to determine whether it supports a circuit court's decision, *Randall v. Randall*, 2000 WI App 98, ¶ 7, 235 Wis. 2d 1, 612 N.W.2d 737; and we do so here.

¶ 20. Patricia suggests the court implicitly decided that she needed additional income. However, we

have difficulty in reconciling such a decision with the court's decision that it was not necessary that James work beyond his regular job in order to meet Patricia's needs. Moreover, since the amount of the moonlighting income is not known, we cannot assume that the court decided that Patricia needed any particular amount of additional income. It may be the court decided that sharing in James's moonlighting income would permit Patricia to continue to save for college for the two younger sons, but we are hesitant to assume this with no indication this is what the court had in mind. First, the amount and duration of savings would be important for a proper exercise of discretion, and the court made no findings on either. Second, this basis for maintenance has implications for future decisions on maintenance when there is no need for college savings, and therefore it is important that it be clearly defined by the circuit court.

¶ 21. We have also tried to discern whether the court decided that fairness required that James share his moonlighting income 50/50. Although the court may have done so, we are unable to identify the reason for such a decision with any confidence. For example, the court's application of the statutory factors does not suggest to us a reason for a 50/50 split of any moonlighting income.

¶ 22. Finally, Patricia suggests that the court's order was based on James's history of keeping the amount of his moonlighting income a secret from Patricia during the marriage. However, the connection between that conduct of James and the objectives of maintenance is not readily apparent to us, and we therefore decline to assume that is the basis for the court's decision without some reasoned explanation by the court.

■■■■

¶ 23. In short, while the award of $50 per month was based on factors other than a disparity in income—because of the court's analysis of the reasonable budget of each, the employment income of each, and the child support—we are unable to identify how the court arrived at the decision to order a 50/50 split of James's net profits from moonlighting, particularly given its reasons for not imputing income to James based on his past moonlighting. We therefore conclude we must reverse the judgment as it relates to maintenance based on James's future moonlighting income and remand for further proceedings.

¶ 24. James's objection to the prohibition on moonlighting for free except for specified family members may remain an issue after remand. We therefore choose to address this issue. James asserts the court has no authority to determine how he spends his free time, and that this provision prevents him from donating his skills to charity and doing favors for friends and relatives who are not among the specified family members.

■■■■■■■■

¶ 25. In a divorce proceeding the circuit court has only that authority given it by statute. *Zawistowski v. Zawistowski*, 2002 WI App 86, ¶ 16, 253 Wis. 2d 630, 644 N.W.2d 252. The circuit court has the authority under Wis. Stat. § 767.26 to enter "an order requiring maintenance payments to either party for a limited or indefinite length of time" after considering the statutory factors and the objectives of support and fairness. Although a maintenance award is usually in a fixed sum, it may be represented as a percentage of income in "unusual circumstances," such as when there is uncertainty on the amount of income the payer will receive,

or when the court finds a payer may manipulate his or her income. *Hefty v. Hefty*, 172 Wis. 2d 124, 132, 493 N.W.2d 33 (1992).

¶ 26. We conclude the court's authority to order maintenance encompasses the authority to impose obligations on the payee to ensure compliance with the payment order if those obligations are reasonably necessary to effect compliance with the payment order. The imposition of such nonpayment obligations is, like the decision on maintenance itself, committed to the circuit court's discretion. Therefore, in order to affirm as a proper exercise of discretion, a reviewing court must be able to discern the reason the circuit court decided that the nonpayment obligation was reasonably necessary to ensure compliance with the payment order, and there must be support for that reasoning in the record.

¶ 27. We understand from the circuit court's comments that it imposed the restrictions on moonlighting for free because of evidence that during the marriage James had not revealed to Patricia the amount he had earned moonlighting. The court apparently credited Patricia's concern that James would continue to moonlight but would not disclose it. However, we have difficulty seeing how the restriction on free moonlighting is reasonably necessary to ensure that James fulfills his obligation to pay Patricia 50% of the net profits of his moonlighting income, particularly in view of the reporting and recording requirements the court imposed and the availability of remedial and punitive sanctions for James's failure to comply with those terms. *See* Wis. Stat. §§ 767.305 and 785.03(1). We

therefore conclude we must reverse this provision and remand for further proceedings.[5]

*Patricia's Budget*

¶ 28. Patricia contends the circuit court erroneously exercised its discretion when it excluded from her budget the lease payments for the 1999 Ford Escort for the parties' middle son, and did not consider a college fund for the younger two sons in setting maintenance. We conclude the circuit court properly exercised its discretion on both points.

¶ 29. The evidence with respect to the 1999 Ford Escort was that a few months before Patricia initiated this action, she signed a thirty-six-month lease for the vehicle, new at the time, with the intent that Shaun, then just beginning his senior year in high school, would use the car that year and then take it to college with him. The sticker price on the car was $18,000 and the monthly lease payments were $300. Patricia and James already had a third car, a 1991 Ford Tempo. James testified he did not sign the lease because he did not agree they should acquire a new car; he told Patricia they did not need a new car and could not afford one. He felt the Tempo was adequate for Shaun's use. The court found that the purchase of the new car was unnecessary and was a unilateral decision by Patricia. This is

---

[5] James asserts, in one sentence that appears in his argument on the prohibition against free moonlighting, that the court did not consider the tax consequences of the order that he pay 50% of his net profits to Patricia, and therefore she will receive more than 50% of the net after taxes. However, he does not develop this argument further. We therefore do not consider it.

supported by the evidence and is a logical basis for excluding this expense when deciding on a reasonable budget for Patricia.

¶ 30. With respect to money for a college fund, Patricia testified that because her sons had the potential for college, she had begun saving for college. She testified there had been $10,600 in a joint savings account intended for college for the middle son, but, because of withdrawals ordered during the divorce proceedings for other expenses, the balance was reduced to $5,321. Patricia argues on appeal, as she did in the circuit court, that savings for her sons' college education was part of her pre-divorce standard of living, and the court has the authority to take this into account in setting maintenance. Patricia relies on *Hubert v. Hubert*, 159 Wis. 2d 803, 820, 465 N.W.2d 252 (Ct. App. 1990), in which we held that the circuit court erred in failing to consider the parties' savings and investment program as part of the pre-divorce standard of living for purposes of determining a reasonable budget for the spouse receiving maintenance. However, we also acknowledged in *Hubert* that it was "not the usual case" because of the very high income of the payer, which appeared to make it feasible to pay a level of maintenance that would maintain the payee spouse at the pre-divorce standard. *See id.* at 818, 820–21.

¶ 31. The circuit court here discussed *Hubert*, correctly reciting that case's reasoning and holding. However, the court decided against including savings for college in Patricia's budget because it found that the parties had not agreed to establish or maintain a college account, and there was not sufficient income to fund such an account. The court correctly applied the law to the facts of this case in a reasoned manner.

*Retroactivity*

¶ 32. Patricia's final challenge on maintenance is to the court's ruling not to make maintenance retroactive to the date of the temporary orders. The family court commissioner had denied her request for temporary maintenance and had set child support based solely on James's income from Wilke Electric. Patricia requested de novo review by the circuit court, but that had not occurred by the time of trial. Her minimal argument in her post-trial brief was that her case at trial

> focused on evidence and arguments that James should be required to pay maintenance and child support calculated on both his Wilke Electric income and his sideline earning job capacity. If the court makes such a prospective award, Patricia urges the court to make that ruling retroactive to [the date of the temporary orders].

Patricia cited "reasons of fairness," without further elaboration as the basis for a retroactive application. The court, in its written decision after trial, stated that it was declining to make any changes in the temporary orders, and that its orders regarding maintenance and child support were prospective. On appeal, Patricia argues that the court did not give any reason for this decision and thus erroneously exercised its discretion.

¶ 33. Patricia's argument on appeal is too undeveloped to persuade us that the court erroneously exercised its discretion. As we read her argument in her post-trial brief, her primary concern was that orders based on imputing income to James from moonlighting be made retroactive. However, the court did not impute moonlighting income to James, and ordered only $50

per month in maintenance. Nothing in the argument she made in the circuit court or makes in this court explains why it is unreasonable or unfair for the court to order James to pay $50 per month prospectively only.

*Summary*

¶ 34. In summary, we affirm the judgment insofar as it ordered that James pay Patricia $50 per month in maintenance, and we reverse paragraph 21 of the judgment of divorce, which relates to James's moonlighting income. On remand the court shall consider whether to order James to pay any particular amount or any particular percentage of his moonlighting income to Patricia as maintenance, and shall articulate the reasons for that decision in light of this opinion. The court shall also consider the prohibition on free work in light of this opinion and shall articulate its reasons for that prohibition should it decide to retain it.

## II. Property Division

¶ 35. The only property that remains individual property and not subject to division is property acquired before or during the marriage by gift or inheritance, or acquired with funds from either. Wis. Stat. § 767.255(2)(a).[6] All other property is part of the marital estate, and the court is to presume that it is to be divided equally, although the court may alter the

---

[6] Property that is separate under Wis. Stat. § 767.255(2)(a) may be divided in a fair and equitable manner if the court finds that refusal to do so will create a hardship on the other party or the children. Section 767.255(2)(b).

distribution after considering various factors. WIS. STAT. § 767.255(3);[7] *Hokin*, 231 Wis. 2d at 191–92.

[7] WIS. STAT. § 767.255(3) provides:

(3) The court shall presume that all property not described in sub. (2)(a) is to be divided equally between the parties, but may alter this distribution without regard to marital misconduct after considering all of the following:

(a) The length of the marriage.

(b) The property brought to the marriage by each party.

(c) Whether one of the parties has substantial assets not subject to division by the court.

(d) The contribution of each party to the marriage, giving appropriate economic value to each party's contribution in home-making and child care services.

(e) The age and physical and emotional health of the parties.

(f) The contribution by one party to the education, training or increased earning power of the other.

(g) The earning capacity of each party, including educational background, training, employment skills, work experience, length of absence from the job market, custodial responsibilities for children and the time and expense necessary to acquire sufficient education or training to enable the party to become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage.

(h) The desirability of awarding the family home or the right to live therein for a reasonable period to the party having physical placement for the greater period of time.

(i) The amount and duration of an order under s. 767.26 granting maintenance payments to either party, any order for periodic family support payments under s. 767.261 and whether the property division is in lieu of such payments.

(j) Other economic circumstances of each party, including pension benefits, vested or unvested, and future interests.

(k) The tax consequences to each party.

¶ 36. James contends: (1) the circuit court erred in including his equitable IRA in the marital estate because that was purchased with inherited funds, and (2) the court erroneously exercised its discretion in not awarding James more than 50% of the property since inherited funds were the source of some of the marital property. Patricia contends the court erroneously exercised its discretion by: (1) not crediting her for voluntary contributions she made to her 403(b) plan during the pendency of the divorce, and (2) not including the 1999 Ford Escort lease payment as a marital debt.

*James's IRA*

¶ 37. When James's mother died, he received one-third of her estate, the major asset of which was a land contract. He received payments of approximately $100 per month between 1983 and 1988, and a balloon payment of $20,000 in March 1988. Most of the $20,000 went to pay marital debts and invest in marital assets, but James gave Patricia $8,000 so that she could set up an IRA for each of them in the amount of $4,000. She did that through their joint checking account. At the date of trial, each IRA had a gross value of $24,600 less a stipulated 20% discount for anticipated taxes. The parties agreed that Patricia's IRA should be included in the marital estate. The court determined that although the source of James's IRA was inherited property, "it

(L) Any written agreement made by the parties before or during the marriage concerning any arrangement for property distribution; such agreements shall be binding upon the court except that no such agreement shall be binding where the terms of the agreement are inequitable as to either party. The court shall presume any such agreement to be equitable as to both parties.

(m) Such other factors as the court may in each individual case determine to be relevant.

was transmuted and became part of the marital estate as it went through the joint checking account."

¶ 38. If gifted or inherited property looses either its identity or its character, it becomes subject to division as part of the marital estate. *Friebel v. Friebel*, 181 Wis. 2d 285, 298, 510 N.W.2d 767 (Ct. App. 1993). Character, which is what is at issue in this case, addresses the manner in which the parties have chosen to title or treat gifted or inherited property. *Id.* The character of property that is exempt as gifted or inherited property may be "transmuted" to divisible property when the owning spouse transfers that property into joint tenancy or uses it to purchase property for the mutual enjoyment and use of the marriage. *Id.* The issue underlying transmutation is whether the owning spouse had a donative intent. *Trattles v. Trattles*, 126 Wis. 2d 219, 224, 376 N.W.2d 379 (Ct. App. 1985). Depositing gifted funds into a joint bank account owned by both parties creates a presumption of donative intent subject to rebuttal by sufficient countervailing evidence. *See id.*

¶ 39. The party claiming an exemption must first establish the gifted or inherited status of the property; then the burden is on the other party to prove that the property has lost its exempt status. *Brandt v. Brandt*, 145 Wis. 2d 394, 408–09, 427 N.W.2d 126 (Ct. App. 1988). In this case, it is undisputed that the $8,000 was inherited property. The burden is therefore on Patricia to establish that, through his donative intent, James transmuted both the $4,000 for his IRA and the $4,000 for her IRA into divisible property.

¶ 40. James argues that Patricia did not prove James's donative intent because the evidence shows

that the funds for that purchase were only temporarily deposited in the joint account and that he instructed her to buy an IRA in his name.

¶ 41. Patricia testified that the $8,000 was deposited in the joint checking account with James's knowledge, and that the other payments he had received from the land contract had also been deposited in the joint checking account and used for household expenses. After explaining that some of the $20,000 was used to pay off a lawn tractor and for the sewer hookup for their home, James testified with respect to the $8,000 used for the IRAs:

> A: .... And the $8,000 here, I suggested that we get a financial person who I know — who I knew, and I made the suggestion that we should put it into a couple IRA's [sic]; $4,000 in each IRA.
>
> ....
>
> A: Well, I got the check from my mother and I told her[, Patricia,] to put it into the finances because she — my wife was in charge of the finances. And I told her to take the money and put it into the IRA's [sic] for financial —
>
> Q: What was that?
>
> A: — for financial reasons, so we could make some money on some of the money that my mother gave me; that we didn't have to spend it all.

¶ 42. Following *Trattles*, we conclude that the deposit of the $8,000 in the joint account with James's knowledge creates a rebuttable presumption that he intended the inherited funds be used for family or marital purposes. We reject James's contention that, because the funds remained in the joint account only a

short time before the purchase of the IRAs, no presumption arises. No case law supports that proposition. The length of time inherited funds remain in a joint account and their subsequent disposition are properly considered as part of the inquiry into whether the presumption of donative intent is rebutted by other evidence.

■■

¶ 43. Turning to that inquiry, we first observe that the circuit court did not discuss whether other evidence rebutted the presumption. We interpret this as an implicit conclusion that no evidence did, and we reach the same conclusion.[8] James's suggestions to

---

[8] Our decisions on the standard of review we are to apply to this inquiry do not appear to be consistent. As James points out, in *Popp v. Popp*, 146 Wis. 2d 778, 787, 432 N.W.2d 600 (Ct. App. 1988), when reviewing the question whether the character and identity of gifted property had been preserved, we stated that whether a party had met the burden of proof is a question of law, which we review de novo; we also said that a determination of character and identity were each questions of law, dependent on the underlying factual findings, and we reviewed those de novo. *Id.* at 787–88. In *Popp*, we distinguished our statement in *Brandt v. Brandt*, 145 Wis. 2d 394, 407, 427 N.W.2d 126 (Ct. App. 1988), that "a tracing or commingling determination [when identity is in issue] . . . present[s] a question of fact"; we explained that in *Brandt* we meant the historical facts, not the legal conclusion of identity resulting from those historical facts. *Popp*, 146 Wis. 2d at 787 n.2. However, we subsequently stated that we must accept a circuit court's finding that gifted property lost its identity through commingling because it was not clearly erroneous. *Fowler v. Fowler*, 158 Wis. 2d 508, 518, 463 N.W.2d 370 (Ct. App. 1990). We used the clearly erroneous standard again in *Weberg v. Weberg*, 158 Wis. 2d 540, 552, 463 N.W.2d 382 (Ct. App. 1990), when reviewing a circuit court's "findings" that funds were not commingled. And in *Zirngibl v. Zirngibl*, 165

Patricia that *"we* get" a financial person to advise and *"we* should put it into a couple of IRA's ... so *we* could make some money" (emphasis added) support rather than rebut the presumption of donative intent arising from deposit into the joint account. Since there is no evidence that rebuts the presumption of donative intent arising from the deposit in the joint account, we conclude the circuit court was correct in deciding that Patricia had established transmutation of the entire $8,000.

■

¶ 44. Even if his IRA is marital property, James argues, the circuit court should have awarded him a greater share of the property in recognition of the inherited funds that were transmuted into marital property. The circuit court considered this request and rejected it.[9] The court acknowledged that it had the authority to deviate from a 50/50 property division in James's favor because the source of some of the marital property was his inheritance.[10] However, it concluded that was not appropriate in this case because this was a

Wis. 2d 130, 136 n.1, 477 N.W.2d 637 (Ct. App. 1991), we treated the issue of intent, for purposes of character transmutation, as a factual issue. More recently, in *Spindler v. Spindler*, 207 Wis. 2d 327, 338, 558 N.W.2d 645 (Ct. App. 1996), we applied the burden of proof/question of law standard that we applied in *Popp*. Rather than attempt a reconciliation of these cases, we will assume without deciding that a de novo standard of review is the proper one; we do this because the standard of review would not affect the outcome in this case.

[9] Specifically, James asked the circuit court to award him his IRA without a balancing payment to Patricia, and that is the request the court considered.

[10] As the circuit court observed, in *Schwartz v. Linders*, 145 Wis. 2d 258, 263, 426 N.W.2d 97 (Ct. App. 1988), we held that a court has the authority under Wis. Stat. § 767.255 to consider

long marriage, and, given Patricia's contributions to the marriage, she would not be receiving a "windfall" if James's IRA was treated as marital property. The court also considered the relationship between the property division and the maintenance award, *see* WIS. STAT. § 767.255(3)(i), and concluded that its decision not to impute income to James based on his past moonlighting work and to award only $50 in maintenance to Patricia counseled against a deviation from the 50/50 presumption based on the inherited source of James's IRA. Then, concluding no other statutory factor warranted a deviation from that presumption, the court divided the marital property 50/50.

¶ 45. The circuit court applied the correct law to the facts of record and gave a logical and thoughtful explanation for not deviating from the presumed 50/50 division because of James's inherited property. This is a reasonable result and we see no basis for disturbing it.

*Patricia's Post-Separation Pension Contributions and the Vehicle Lease*

¶ 46. Patricia contends she should receive a credit of $1,065 for contributions she made to her 403(b) retirement plan during the pendency of the divorce. Patricia was required by a temporary order to continue her voluntary monthly payments to the retirement plan. Although she sought relief from that order and a de novo review, the order remained in effect up to the

the prior inherited status of divisible property; whether it results in an unequal division of the property, depends on the facts of each case. *Id.* By way of example, we stated that in a short marriage where one party would otherwise receive a windfall without having participated in the economic partnership of the marriage, the prior inherited status of divisible property may justify an unequal division. *Id.*

time of trial for reasons not relevant to this opinion. Patricia argued to the circuit court that she should receive credit because that obligation contributed to a shortfall, as a result of which she had to use part of the college savings to pay on the home-equity loan and the property taxes. She also argued that it would be a windfall to James to receive half of these post-separation payments.

¶ 47. The circuit court rejected her request, reasoning that if Patricia had not contributed to her retirement plan during the divorce, the savings she would not have had to dip into would be part of the marital estate. Since those savings were spent on marital debts with the approval of the family court commissioner, and since the effect of her contributions to her retirement plan was that the money was in that plan rather than in the marital savings account, the court concluded that the contributions to her retirement plan should be treated as marital property, just as all the pensions were treated.

¶ 48. Generally, assets are valued and divided on the date of divorce. *See Overson v. Overson*, 125 Wis. 2d 13, 21, 370 N.W.2d 796 (Ct. App. 1985). In this case, the value of James's retirement accounts, as well as Patricia's, included payments made pending the divorce proceedings, and the entire value of his accounts on the date of divorce was treated as marital property. The circuit court's explanation for not treating Patricia's post-separation contributions differently is supported by the record and is rational.

¶ 49. Patricia also contends the circuit court erroneously exercised its discretion in not treating the 1999 Ford Escort lease as a marital debt. As we have already

explained, the record supports the court's decision that this was an unnecessary debt incurred by Patricia without James's agreement. We are satisfied that the court's decision not to require James to pay one-half of this debt is a proper exercise of discretion.

### III. Child Support

¶ 50. In setting child support, the court is to apply the percentage standards established in WIS. ADMIN. CODE ch. DWD 40 unless the court determines, after consideration of certain statutory factors, that use of the percentage standard is unfair to the child or to either party. WIS. STAT. §§ 767.25(1j) and 767.25(1m);[11] Randall, 2000 WI App 98 at ¶¶ 8–9. WISCONSIN ADMIN. CODE § DWD 40.03(1) provides that for one child, sup-

---

[11] WISCONSIN STAT. § 767.25(1m) provides:

(1m) Upon request by a party, the court may modify the amount of child support payments determined under sub. (1j) if, after considering the following factors, the court finds by the greater weight of the credible evidence that use of the percentage standard is unfair to the child or to any of the parties:

(a) The financial resources of the child.

(b) The financial resources of both parents.

(bj) Maintenance received by either party.

(bp) The needs of each party in order to support himself or herself at a level equal to or greater than that established under 42 U.S.C. 9902 (2).

(bz) The needs of any person, other than the child, whom either party is legally obligated to support.

(c) If the parties were married, the standard of living the child would have enjoyed had the marriage not ended in annulment, divorce or legal separation.

(d) The desirability that the custodian remain in the home as a full-time parent.

port is 17% of the payer's gross income and income imputed from assets.[12] Section DWD 40.03(3) provides:

> In situations where the income of the parent obligated to pay child support in accordance with the standard under sub. (1) is less than that parent's earning capacity . . . the court may establish support by applying the percentage standard to:
>
> (a) An amount determined by the court to represent the payer's ability to earn, based on the payer's education, training and work experience, and the availability of work in or near the payer's community; or

(e) The cost of day care if the custodian works outside the home, or the value of custodial services performed by the custodian if the custodian remains in the home.

(ej) The award of substantial periods of physical placement to both parents.

(em) Extraordinary travel expenses incurred in exercising the right to periods of physical placement under s. 767.24.

(f) The physical, mental and emotional health needs of the child, including any costs for health insurance as provided for under sub. (4m).

(g) The child's educational needs.

(h) The tax consequences to each party.

(hm) The best interests of the child.

(hs) The earning capacity of each parent, based on each parent's education, training and work experience and the availability of work in or near the parent's community.

(i) Any other factors which the court in each case determines are relevant.

[12] WISCONSIN ADMIN. CODE § DWD 40.03(1) refers to "imputed income for child support" and that is defined in WIS. ADMIN. CODE § DWD 40.02(15) with reference to income from assets.

(b) The income a person would earn by working 40 hours per week for the federal minimum hourly wage under 29 U.S.C. 206(a)(1).

¶ 51. For reasons similar to those she made in the context of maintenance, Patricia contends the circuit court erroneously exercised its discretion in not imputing income from moonlighting to James for child support purposes because he is not working at his earning capacity and he is shirking. However, as we have already concluded, the court determined that neither was the case, and those determinations are supported by the record.

¶ 52. Patricia also argues that the percentage standard is unfair to the minor child and to her if based only on James's actual income, because during the marriage the child had the benefit of the moonlighting income and that is an appropriate factor for deviating upward from the percentage standard under WIS. STAT. § 767.25(1m)(c). Although the circuit court did not expressly address James's moonlighting in the context of § 767.25(1m)(c), we are satisfied from its thorough discussion of the issue of James's past moonlighting—as it affected both child support and maintenance—that the court decided it was not necessary to require James to continue moonlighting in order to adequately provide for the minor child. This decision is supported by the record and implicitly rejects the proposition that an upward deviation under § 767.25(1m)(c) is necessary to provide for the minor child at the pre-divorce standard of living.

¶ 53. Patricia's second proposed ground for an upward adjustment under WIS. STAT. § 767.25(1m) is that James spends much less time with the minor child

544

than the percentage standards contemplate, and, thus, he is spending less money in addition to 17% of his gross income than that percentage assumes. Patricia contends the circuit court erroneously decided it did not have the authority to increase child support for this reason.

¶ 54. We do not agree with Patricia that the court believed that, as a matter of law, it could not increase child support because James spent very little time with the minor child. We grant the court's initial comments may be read in this way: the court observed that Wis. Admin. Code ch. DWD 40 provided for decreased support when the child spent time with the payer above a prescribed amount, *see* Wis. Admin. Code § DWD 40.04(2), but not for increased support when the child spent less than a prescribed amount. However, we are persuaded from a reading of all the court's comments that this was not the basis for the court's decision not to increase the percentage. The court continued in its discussion, stating that the record showed that in 2000, the minor child spent "only a handful of nights with his dad," and it acknowledged the logic of Patricia's argument of an increase for this reason. However, the court explained there was not a need for an upward adjustment because the court was going to be considering the disposable income of both parties in deciding on maintenance, and any increase in child support it ordered would reduce maintenance. Therefore, the court concluded, an upward adjustment in child support would not benefit Patricia and there was no reason to adjust the percentage standard. Patricia does not contend that this reasoning is an erroneous exercise of discretion, so we consider this issue no further.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.